915 A.2d 1122

## COMMONWEALTH of Pennsylvania, Appellee

v.

## John Charles EICHINGER, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 17, 2006.

Decided Feb. 20, 2007.

Reconsideration Denied March 26, 2007.

2

4

William Read McElroy, Norristown, for John Eichinger.

Bruce Lee Castor, Jr., Montgomery County District Attorney's Office, Amy Zapp, Harrisburg, Patricia Eileen Coonahan, Norristown, Montgomery County District Attorney's Office, for Commonwealth of Pennsylvania.

Before CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER, BALDWIN, JJ.

## *OPINION*

Chief Justice CAPPY.

This is a direct appeal from the imposition of three sentences of death [1]. On October 18, 2005 John Charles Eichinger waived his right to a jury and was tried in a stipulated bench trial for four counts of first-degree murder,[2] two counts of possession of an instrument of crime [3] and three counts of unsworn falsification to authorities [4] in relation to the murders of Jennifer Still, Heather Greaves, Lisa Greaves and Avery Johnson. He was convicted on all counts. A jury of his peers sentenced Eichinger to death. For the following reasons, we affirm the judgment of sentence.

The facts are not in dispute.[5] On the morning of March 25, 2005 Eichinger drove to the Greaves' residence. Eichinger

1. 42 Pa.C.S. § 722(4) and § 9711(h)(1).

2. 18 Pa.C.S. § 2502(a).

3. 18 Pa.C.S. § 907.

4. 18 Pa.C.S. § 4904(a).

5. For the purpose of the guilt-phase bench trial, both parties stipulated to the evidence presented by the Commonwealth at the September 15,

told police that he intended to kill Heather Greaves unless she ended her relationship with her most recent boyfriend. To this end, Eichinger arranged to meet with Heather so that she would be expecting him at her house that day. Eichinger carried a large knife and a pair of rubber gloves in his waistband and concealed them under his sweat jacket.

Eichinger went into the house to speak with Heather. An argument ensued and Eichinger pulled out the knife and stabbed her repeatedly in the stomach. Eichinger admitted that he purposefully stabbed Heather in the stomach, because "[he] had heard in movies and books that it was easier to puncture organs there than through the chest, where it is more difficult because of hitting bone." Pre-trial Hearing 9/15/05, Commonwealth's Exhibit CS–11.

Avery, Heather's three-year-old daughter, was in the room and witnessed the stabbing. When Heather cried to Avery to call 911, Eichinger turned away from Heather and slashed Avery in the neck. Avery ran down the hallway before she fell. Eichinger followed her and came upon Lisa, Heather's sister coming out of the bathroom. Eichinger confessed to police, "I had to stab Lisa, too. I couldn't go to jail." Pre-trial Hearing 9/15/05, Commonwealth's Exhibit CS–6. Lisa tried to run back into the bathroom and shut the door, but Eichinger was able to overpower her. He stabbed Lisa repeatedly in the stomach.

Eichinger moved back towards the kitchen where Heather was dying, but not before he stabbed Avery once more, in the back. He stabbed her with such force that the blade came out her chest, and pinned her to the floor. Eichinger admitted to police that, "I couldn't even let the three-year old identify me. I had known her since she was born and she knew my name. She could speak my name." [6] Back in the kitchen, Eichinger stabbed Heather in the diaphragm and slit her throat.

2005 Pre–Trial Hearing. The evidence is preserved in the pre-trial notes of testimony. (Stipulated Bench Trial 10/18/05 p. 23).

**6.** Pre-trial Hearing 9/15/05, Commonwealth's Exhibit CS–11.

Eichinger went to the sink to wash his hands and noticed he was cut. He used one of the rubber gloves to prevent his blood from being left at the crime scene. Before leaving, Eichinger cut open Lisa's shirt to make it appear that she had been the target of the rampage in order to confuse the police. Heather and Lisa's father discovered the murders later that day. The police spoke to a neighbor who had witnessed Eichinger leaving the Greaves' home that morning.

Upon receiving this information, Detective Richard Nilsen, a Montgomery County Detective, along with Detective James Godby of the Upper Merion Police Department, went to the Somers Point, New Jersey Acme Food Market where Eichinger was employed. Eichinger agreed to be interviewed. After some discussion, and a false statement to the police, Eichinger confessed to the Greaves murders.

During the same conversation, Eichinger also confessed that he used the knife from the Greaves' murders to kill another woman, Jennifer Still, on July 6, 1999. Eichinger admitted to police that he killed Jennifer because she rejected him in order to stay with her fiancé. Eichinger described this murder:

> I had the knife in my hand. I turned away from her for a second and couldn't believe she was doing that to me. She got real close to me. I thought, 'You're ripping my heart out and now you're getting close to me.' She put her hand on my shoulder. I turned around and stabbed her in the stomach.
>
> \* \* \*
>
> After I stabbed her the first time, she stepped back, but didn't fall. Her blood splattered out at me. I lunged at her. I just kept stabbing her.
>
> \* \* \*
>
> I slit her throat as she slid down the wall. I let her body weight cut her throat against the knife.[7]

Eichinger saved his clothes from that day, and collected articles about the murder to serve as reminders. After using

7. Pre-trial Hearing 9/15/05, Commonwealth's Exhibit CS–11.

the knife to kill Jennifer in 1999, he stored it in a sheath in a cooler. Eichinger told police, "I had it in the cooler with the rubber gloves and the Scream mask. Every Halloween I put the mask, gloves, and knife on and handed out candy at the door." [8]

As a result of his confessions, Eichinger was arrested and later transported back to Montgomery County. In transit, Eichinger made another incriminating statement describing the triple-homicide as well as the earlier murder of Jennifer Still to the police. This statement was later memorialized in writing.

Eichinger filed an omnibus pre-trial motion seeking to suppress his statements to the police. This motion was denied. Eichinger and Detective Nilsen then testified at a pre-trial hearing on September 15, 2005. The trial judge found Detective Nilsen's testimony to be credible and found that all of the statements made by Eichinger to the police were admissible at trial. *See* Findings of Fact and Conclusions of Law, 9/16/05.

Eichinger waived his right to a jury in favor of a guilt-phase bench trial which was held on October 18, 2005. Eichinger did not contest the charges against him and offered no defense, rather he stipulated to the evidence offered by the Commonwealth at the September 15th Pre–Trial Hearing.[9] Eichinger was adjudicated guilty of all charges, and the Commonwealth sought the penalty of death for the murders of Heather Greaves, Lisa Greaves and Avery Johnson. The sentencing phase was tried before a jury beginning on November 1, 2005. Although he did not contest his guilt, Eichinger did contest the imposition of the death penalty. The jury found two aggravating factors in the death of Heather Greaves: that Eichinger had been convicted of another state offense for which a sentence of life imprisonment is imposable [10] and that Eichinger had been convicted of another murder which was

8. *Id.*

9. *See supra* n. 5.

10. 42 Pa.C.S. § 9711(d)(10).

committed before or at the time of the offense at issue.[11] The first aggravating factor related to the murder of Jennifer Still six years earlier. The second related to the murder of Lisa Greaves and Avery Johnson which was contemporaneous with the murder of Heather Greaves. The jury then found the same two aggravators for the murder of Lisa Greaves plus a third aggravating factor, that the victim was a witness to a murder and was killed to prevent her testimony in any criminal proceeding concerning the offense.[12] The jury also found the same three aggravating factors they found for Lisa Greaves for the murder of Avery Johnson, plus a fourth aggravating factor, that Avery Johnson was a child less than twelve years of age.[13] The jury determined that there was one mitigating factor for each of these three murders, namely that Eichinger was under the influence of extreme mental or emotional disturbance.[14] Finding that the weight of the aggravating factors was greater than the weight of the mitigating factor in each case, the jury returned a verdict of death for the murders of Heather, Lisa and Avery.

On December 12, 2005 the trial court imposed three consecutive death sentences for the murders of Heather and Lisa Greaves and Avery Johnson and one sentence of life imprisonment for the murder of Jennifer Still. The court additionally imposed two consecutive sentences of 2.5 to 5 years for possessing an instrument of crime and three consecutive sentences of 1 to 2 years for unsworn falsification. No post-sentence motions were filed. This appeal followed.

When the Commonwealth of Pennsylvania imposes a penalty of death, this court will conduct an independent review of the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard for review of the sufficiency of the evidence is

11. 42 Pa.C.S. § 9711(d)(11).
12. 42 Pa.C.S. § 9711(d)(5).
13. 42 Pa.C.S. § 9711(d)(16).
14. 42 Pa.C.S. § 9711(e)(2).

whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to enable the factfinder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Ockenhouse,* 562 Pa. 481, 756 A.2d 1130, 1135 (2000).

In order to sustain a finding of first-degree murder, the evidence must establish the unlawful killing of a human being, that the appellant did the killing and that the killing was done in an intentional, deliberate and premeditated way. *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624, 626 (1991). The use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker,* 540 Pa. 80, 656 A.2d 90, 90(Pa.), *cert. denied,* 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995).

Our review for sufficiency of the evidence is required of only the three murders for which Eichinger received the death penalty. The evidence presented at trial and the penalty phase hearings demonstrates that Eichinger stabbed Heather Greaves in the abdomen with a knife. He then slashed the throat of Avery Johnson who called for help. He then stabbed Lisa Greaves 35 times, returned to Avery to stab her in the back and finally stabbed Heather in the diaphragm and then slashed her throat. Based on his own admissions there is no question that it was Eichinger who killed the victims, and that he did so with premeditated intent. Eichinger further confirmed his actions and their deliberate nature in a 90–page–personal journal that he published to his brother from his prison cell. Viewed in the light most favorable to the Commonwealth, as verdict winner, we find these acts are sufficient beyond a reasonable doubt to establish murder of the first degree in each death.

Having resolved the sufficiency of the evidence inquiry, we now turn to the issues raised by Eichinger in his brief. In his first issue, Eichinger contends that the trial court erred when it denied his motion to suppress the statements that he gave

to Montgomery County detectives at the Acme Food Market in New Jersey. Eichinger argues that he was subject to custodial interrogation without the benefit of *Miranda* warnings when the detectives first took him into the market office to question him.[15] He claims that the subsequent statements, after he had been *Mirandized,* were tainted by the previous statements made to the detective pursuant to *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The Court in *Seibert* held that *Miranda* warnings given mid-interrogation, after the defendant gave an unwarned confession, are ineffective and thus a confession repeated after warnings were properly given was inadmissible at trial. *Id.* at 616–17.

The Commonwealth contends that Eichinger was not in custody when the detectives first spoke with him. However, the Commonwealth avers that Eichinger was properly *Mirandized* at the moment he was actually taken into custody.

On this issue, the facts are not in dispute as Eichinger stipulated to Detective Nilsen's testimony.[16] The detective, accompanied by Detective Godby, went to the Somers Point Acme Food Market in New Jersey, where Eichinger worked. Eichinger agreed to talk to the detectives in an office on the second floor, where the detectives made it clear to him that he was not under arrest and remained free to leave. Eichinger then made a statement concerning his whereabouts that morning that the detectives knew to be false.

After Eichinger made this statement Detective Nilsen left the room and stood in the hall for a few moments. He then returned and suggested to Eichinger that he had just received information that the police would find DNA in the Greaves' driveway that would link Eichinger to the murders. Eichinger dropped his head, crying, and said, "I did it." In order to clarify, Detective Nilsen asked, "Do you mean that you killed Lisa, Avery and Heather Greaves?" Eichinger said, "Yes."

15. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

16. *See supra* n. 5. *See also* Commonwealth's Exhibits CS–4, and CS–6.

18

At this point, Detective Nilsen read him his *Miranda* rights. Eichinger told Detective Nilsen that he understood his rights and that he was willing to voluntarily waive them. Eichinger then gave a signed written statement describing the murder of Heather, Lisa and Avery. As it happened, Detective Nilsen had worked on the Jennifer Still case six years earlier, and the similarity of the murders provoked him to ask Eichinger about Jennifer. The detective re-advised Eichinger of his *Miranda* rights and then Eichinger gave a signed statement confessing to her murder.

In determining whether to suppress the incriminating statements, the trial court applied New Jersey law, apparently of the view that New Jersey law controlled as that was where Eichinger made his statements. New Jersey law defines custodial interrogation as questioning by a law enforcement officer after a suspect has been deprived of his freedom of action in a significant way that implicates the requirement that *Miranda* warnings be given. *State v. Timmendequas*, 161 N.J. 515, 737 A.2d 55, 108 (1999). To evaluate whether or not a defendant has been deprived of freedom of action a court must consider the nature and degree of pressure applied to detain the suspect, the duration of the questioning, the physical surroundings and the language used by the police. *Id.* at 109.

Based on this analysis, the trial court found that Eichinger's first statement was not the product of custodial interrogation as he was not in custody. The questioning occurred in an office at Eichinger's familiar place of employment, not a police station, the door to the office remained open and Eichinger was clearly told he was free to leave. It was not until after he made this initial statement that Eichinger confessed to the Greaves murders. At this point, Eichinger was no longer free to leave and the detectives placed him in custody. The trial court determined that Detective Nilsen then properly read Eichinger his *Miranda* rights and that Eichinger understood these rights and voluntarily and intelligently waived them.

As a threshold matter, we must determine whether there is a conflict of laws question in this case, inasmuch as the trial

court relied on New Jersey law to resolve this issue. Presumably, the trial court did so because Eichinger was placed into custody in New Jersey and it is from this transaction that the suppression issue arises. More specifically, therefore, we must determine whether Pennsylvania or New Jersey law governs the suppression issue.

It is a basic principle of conflict of laws cases involving criminal matters that the "question of jurisdiction and that of governing substantive law always receives the same answer. The governing law is always the law of the forum state, if the forum court has jurisdiction." *Commonwealth v. Ohle,* 503 Pa. 566, 470 A.2d 61, 67–67 (1983) (citing Leflar, *Conflicts of Laws: Choice of Law in Criminal Cases,* 25 Case Western Res. L.Rev. 44, 47 (1974)). Jurisdiction relates to a court's power to hear and decide a case. *Ohle,* 470 A.2d at 67. This concept has its roots in territorial principles and the idea of sovereignty. Leflar, *supra* at 45. Although these conflict of laws concepts have evolved, the traditional theory would argue that the Commonwealth of Pennsylvania is an independent sovereign over persons within its territory and can brook no control of its citizens by a foreign sovereign, nor allow what occurs in its territorial boundaries to be punished by another. *Id.* (citing Levitt, *Jurisdiction over Crimes–II,* 16 J.Crim. L. & Criminology 495, 509–10(1925). Pennsylvania has codified its jurisdiction over the matter under 18 Pa.C.S. § 102(a)(1) which provides for a conviction "under the laws of this Commonwealth" when "the conduct which is an element of the offense ... occurs within this Commonwealth." It is not in dispute that the substantive crime of murder occurred in Pennsylvania. As a result, Pennsylvania has jurisdiction and may apply its law.

Our inquiry could end there. However, although it is not mandated, where more than one state has a substantial connection with the activity in question, the forum state may analyze the interests of all states involved and choose which state's law to apply. *Ohle,* 470 A.2d at 68. In Pennsylvania, we do not apply our law just because we have jurisdiction.

20

Rather, we have adopted a flexible choice of law rule which weighs the interests our sister-states may have in the transaction. *See Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796, 805 (1964). This concept was formally adopted for criminal cases in *Commonwealth v. Sanchez,* 552 Pa. 570, 716 A.2d 1221, 1224 (1998).

To start this analysis, we first note that procedural rules and substantive law require separate considerations. It is a fundamental principle of conflicts of laws that a court will use the procedural rules of its own state. "That is true in both civil and criminal cases, but especially in criminal cases as a sort of corollary to the local nature of substantive criminal law. Procedures in criminal cases are always those of the forum." Leflar, *American Conflicts Law,* Fourth Edition, § 116 (1977). Procedural rules are "that which prescribe the methods of enforcing rights." *Commonwealth v. Sanchez,* 716 A.2d at 1224. On the other hand, substantive law "gives or defines the right." *Id.*

In *Commonwealth v. Sanchez,* we held that an issue of search and seizure is substantive as it involves a strict question of constitutional law which concerns the fundamental right to be free from unreasonable searches and seizures. *Id.* Eichinger raises a constitutional question under the Fifth Amendment, which implicates his right to remain silent and his right to counsel, therefore, the issue must be addressed under the principles of conflict between substantive laws.

As noted before, our choice of law rule when there is a conflict between the substantive criminal laws of this Commonwealth and those of a sister-state, requires that we analyze the policies and interests underlying the rule of each state so that the policy of the jurisdiction most immediately concerned will be applied. *Commonwealth v. Sanchez,* 552 Pa. 570, 716 A.2d 1221, 1223–24 (1998). But it remains implicit in this analysis that there be a conflict between the substantive law of New Jersey and the law of Pennsylvania.

In fact, no conflict exists. Both the Pennsylvania and New Jersey Courts must effectuate the guarantee provid-

ed in the Fifth Amendment of the United States Constitution that, as a general rule, the prosecution may not use statements, whether inculpatory or exculpatory, stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. A suspect in is custody when he is deprived of his freedom of action in any significant way. *Id.* at 445, 86 S.Ct. 1602.

In Pennsylvania, the test for determining whether a suspect is in custody is whether the suspect is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted. *Commonwealth. v. Chacko*, 500 Pa. 571, 459 A.2d 311, 314 (1983) (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). Likewise, in New Jersey, a suspect is in custody where he has been deprived of freedom of action in a significant way. *Timmendequas*, 737 A.2d at 108 (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). These rules align, as they both track *Miranda*. Neither the Constitution of Pennsylvania nor of New Jersey provides additional protection under this particular factual scenario. Thus, there is no actual conflict between the laws of Pennsylvania and New Jersey on this issue.[17] Any interest that New Jersey might have in this transaction is rendered moot by that lack of conflict. With no other interested state to consider, we will apply the law of the Commonwealth.

17. This analysis is distinct from cases involving what has been referred to as a "false conflict." In a false conflict situation, it appears facially that the laws of two states directly conflict with one another. But deeper inquiry reveals that although one state has a conflicting law, the purposes behind that law demonstrates that the state does not in fact have an interest in the question. Courts have recognized that there are many factual situations where, although two jurisdictions have nominal contacts with the transaction, only one jurisdiction is truly concerned with the result. *See, e.g. Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897 (1966); *McSwain v. McSwain*, 420 Pa. 86, 215 A.2d 677 (1966); *Griffith v. United Air Lines*, 416 Pa. 1, 203 A.2d 796 (1964); *Grant v. McAuliffe*, 41 Cal.2d 859, 264 P.2d 944 (1953); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). Here, both states have some contact with the transaction, and, therefore, some interest, but there is no conflict between the laws or their underlying purposes.

22

■ Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111, 112 (1985), *cert. denied* 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985). When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. *Cortez*, 491 A.2d at 112.

After careful review, we conclude that the record supports the findings of the trial court and that there was no legal error. Eichinger essentially argues that his second and third statements to the police, wherein he confessed to all four murders after waiving his *Miranda* rights, were tainted by the fact that he gave an initial statement without the benefit of hearing his *Miranda* rights. Eichinger admits in his brief that he was properly *Mirandized* before he gave the second and third statement, so his argument of taint is his sole means of relief. In order to prove that his later confessions were tainted by his initial statement, he must show that he was in custody, and therefore entitled to *Miranda* warnings, when he made the first statement.

■ The test for determining whether a suspect is in custody is whether the suspect is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. *Commonwealth. v. Chacko*, 500 Pa. 571, 459 A.2d 311, 314 (1983). We agree with the trial court that Eichinger was not in custody when he gave his first statement to the police. Eichinger was invited to talk to police in an office in his place of employment. The door remained open and he was free to speak to the police or not. These circumstances make it clear that Eichinger's

freedom of action or movement were unrestricted while he chose to talk with the police. He was not in custody at the time of the initial conversation and, therefore, that conversation could not serve to taint the later statements he made once he was in custody. Further, the fact that Eichinger was not in custody makes any reference to *Seibert* inapt as the defendant in that case *was* in custody at the time of her initial statement. Eichinger's claim fails.

 Eichinger next contends that the trial court erred when it denied his motion to suppress a statement he gave to the Montgomery County detectives when they transported him from New Jersey to Pennsylvania. This statement was later memorialized into a writing which Eichinger also argues should be suppressed.

The record reveals that Eichinger was incarcerated overnight in New Jersey.[18] Eichinger claims he was tormented by the other prisoners. He waived extradition the next morning and was released to the Montgomery County detectives for the ride back to Pennsylvania to be arraigned. Eichinger avers that, by this time, he had suffered from verbal abuse from fellow prisoners that led to sleep deprivation, and that he had been deprived of the benefit of counsel in court. Eichinger argues that his decision to confess after these events was not a voluntary decision but represented an "overbearing" of his will.[19] Eichinger submits that, because his will was overborne, the statements made while in transit to Pennsylvania should not have been admitted at trial.

The Commonwealth responds by highlighting the fact that the detectives warned Eichinger of his *Miranda* rights before they began to talk with him in the car. Eichinger stated that he understood those rights and was willing to give a voluntary statement. After his preliminary arraignment, Eichinger memorialized those statements in writing. At that time, Detective Nilsen became aware that Eichinger did not have his

18. Eichinger stipulated to the facts that follow. *See supra* n. 5.

19. Eichinger cites to *State v. Galloway,* 133 N.J. 631, 628 A.2d 735 (1992).

glasses and had Eichinger read from his extradition papers to ensure that Eichinger could, in fact, read the statements he signed. Before committing the statement to writing Eichinger was again advised of his rights and Eichinger again waived his rights, signing each page of the statement. He stated that he had not been coerced or threatened but rather, "I didn't feel like hiding it anymore." At no time on March 25, 26, or 28, 2005 did Eichinger ask to speak to a lawyer or ask to remain silent.

The trial court found that Eichinger did not assert his right to counsel and waived extradition. The court noted that the extradition hearing in New Jersey was not an adversarial judicial proceeding akin to any pre-trial proceedings that have occurred in Pennsylvania to which the Sixth Amendment right to counsel would attach. The trial court held that the oral statement and subsequent written statement were admissible at trial.

Again, we hold that the record supports the findings of the trial court and that there was no legal error. It is the Commonwealth's burden to establish whether Eichinger knowingly and voluntarily waived his *Miranda* rights. *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1274 (1989). In order to do so, the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings. *Id.* at 1274. The Commonwealth has met this burden. Despite his contention that his will was overborne, the trial court found that when the officers reminded Eichinger of his rights, he agreed to speak with them. Hours later, Eichinger memorialized his statements in writing, stating that he "didn't feel like hiding it anymore." The record demonstrates that Eichinger received the proper warnings and that his waiver was knowing, intelligent and voluntary. Therefore, his contention that his statement should be suppressed has no merit.

Eichinger makes an additional claim that he was still physically in New Jersey when the detectives began to question him. He cites to *State v. Sanchez*, 129 N.J. 261, 609 A.2d

400 (1992), which holds that as a general rule in New Jersey, prosecutors or their representatives should not initiate a conversation with a defendant without the consent of defense counsel during the period after an indictment and before arraignment. Eichinger maintains that this is further reason to suppress the statement he made while on his way to Pennsylvania to be arraigned. The Commonwealth does not respond to this argument, but the trial court, although it cited to New Jersey law, found that New Jersey has no jurisdiction over the homicide charges and related offenses in Montgomery County, Pennsylvania, and that, therefore, *State v. Sanchez* does not apply.

Once again, it appears that Eichinger has raised a potential conflict of laws issue. As our previous analysis demonstrates, the mere fact that two states are involved does not indicate that there is a conflict of laws problem. *See supra* pp. 20–21, 915 A.2d at 1134. It is necessary to first inquire if there is, in fact, a conflict between the substantive laws of interested states. Here the key phrase is "interested states." In matter of substantive criminal law, as in the civil context, Pennsylvania seeks to apply the policy of the jurisdiction most immediately concerned with the outcome of the legal issue. In other words, the state that has the most interest in the question should have paramount control over the legal issues arising from a particular factual scenario. *Commonwealth v. Sanchez*, 716 A.2d at 1223–24.

In this regard, it is axiomatic in the area of conflict of law, that in order for a state to have an interest in a particular matter, there must be some nexus between the state and the incident in question. The Due Process Clause prohibits a state from applying its substantive laws to a set of facts which have no substantial connection with the state. Leflar, *supra* at 48. In the area of criminal law, this substantial connection has long been grounded in the concept of a state's sovereignty over its own territory, therefore requiring a physical connection between the state and the incident in question in order to invoke a state's interest in applying its

law. *Id.* at 45. This territorial analysis has been greatly expanded to allow a state to apply its law when there are other types of substantial connections described by Leflar as "choice influencing" considerations, but there is no question that there must be a substantial connection to a forum before we will apply its laws.

Here there is no such nexus. The only possible connection to the State of New Jersey was Eichinger's physical presence there on March 25 through the 28th, 2005. The record demonstrates that Eichinger talked to the police during his ride from New Jersey to Pennsylvania, so logically we can postulate that it is possible that some of that conversation may have occurred physically in New Jersey. But the record is entirely devoid of any proof on this point. Eichinger adopted the testimony presented by the Commonwealth at the Pre–Trial Hearing of September 15, 2005, but there was no mention during that hearing by the Commonwealth's witness, Detective Nilsen of exactly where they were when Eichinger made his statement. Although we will only consider the Commonwealth's evidence because of Eichinger's stipulation, it is notable that when Eichinger took the stand at the Pre–Trial Hearing, he also made no mention of his location when he made his statement. We have only a bald assertion in Eichinger's brief to this Court that the statement was made while Eichinger was still physically in New Jersey. This represents a failure of proof on Eichinger's part. He did not meet his burden to establish, as a matter of fact, that there was any nexus between the state of New Jersey and the transaction at issue. The Due Process Clause of the Federal Constitution requires not only a mere connection, but a substantial one in order to apply New Jersey law. As there is no connection of any sort established on the record, we need go no further in a conflict of law analysis, and we will apply the law of Pennsylvania.

Accordingly, any argument by Eichinger that the New Jersey case, *State v. Sanchez,* applies to the matter at hand must fail.

Eichinger next maintains that the trial court erred when it failed to give a presumption of life instruction to the jury. Eichinger requested the following instruction:

There is a presumption of life imprisonment in this case. Unless the prosecution proves beyond a reasonable doubt that the sentence should be death instead of life in prison, you must return a verdict of life in prison. This presumption of life imprisonment remains with Mr. Eichinger throughout these proceedings, unless the prosecution proves to your satisfaction beyond a reasonable doubt that Mr. Eichinger should be put to death instead of being sentenced to life in prison. Any decision by you that the prosecution has prove[n] an alleged statutory aggravating factor beyond a reasonable doubt, must be unanimous and each must be considered separately. The presumption in favor of life imprisonment shall be given effect by you until and unless it is overcome by the prosecution beyond a reasonable doubt.

Eichinger cites to *Commonwealth v. Travaglia*, 502 Pa. 474, 467 A.2d 288 (1983), in which this Court stated, "It may be acknowledged that in some sense there is a 'presumption of life'—this from the fact that the prosecution is limited to specific aggravating circumstances which must be proven beyond a reasonable doubt, while the defendant is permitted great latitude in demonstrating mitigating circumstances, and then by the lesser preponderance standard." *Id.* at 300–01. Eichinger frames his argument as a denial of due process by the trial court.

The Commonwealth maintains that the instructions that were given comported with the standard jury instructions and that there is no standard instruction for a presumption of life.

The trial court found Eichinger's proposed instruction to be redundant as the standard instructions provide that if the jury cannot agree that either there is one or more aggravating factors and no mitigating factor or that aggravating factors outweigh mitigating factors then "the only verdict you may return is a sentence of life imprisonment." Trial Court Opinion 03/03/06, p. 14. Moreover, the instructions specifically provide that if the jury could not unanimously agree, then a

life sentence would result. *Id.* From this language, the trial court concluded that Eichinger's proposed instruction was not necessary.

Our standard of review for penalty phase jury instructions is the same as that which guides us in reviewing a jury charge during the guilt phase of a trial. In reviewing a challenge to a jury instruction the entire charge is considered, not merely discrete portions thereof. *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 708 (1992). The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury. *Id.*

It is the policy of this Court to give our trial courts latitude and discretion in phrasing instructions. Further, *Travaglia's* discussion of a presumption of life is good law. The Commonwealth does bear a heavier burden to show aggravating factors beyond a reasonable doubt while we have consistently held that factors in mitigation need only be proven by a mere preponderance of the evidence. In this we recognize that life has intrinsic value and should not be taken by the state without good cause, proven to our highest standard, whereas life imprisonment remains our default punishment for capital cases.

Although acceptable, the words "presumption of life" are not explicitly required to honor this concept. An explanation of the deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof and a clear indication that life in prison is the sentence unless the Commonwealth meets its high burden is sufficient to convey the fact that life is presumed.

The court began its sentencing instruction to the jury as follows:

Your sentence will depend upon what you find about aggravating and mitigating circumstances. The Sentencing Code defines aggravating and mitigating circumstances, and I'll explain more about that in a moment.

First, however, you must understand that your verdict must be a sentence of death, if and only if, you unanimously find,

that is all of you find, at least one aggravating circumstance and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances that outweigh any mitigating circumstance or circumstances. If you do not all agree on one or the other of these findings, then the only verdict that you may return is a sentence of life imprisonment without parole.

The Commonwealth must prove any aggravating circumstances beyond a reasonable doubt. This does not mean that the Commonwealth must prove the aggravating circumstance beyond all doubt or to a mathematical certainty.

A reasonable doubt is the kind of doubt that would cause a reasonable and sensible person to hesitate before acting upon a matter of importance in his or her own affairs. A reasonable doubt must be a real doubt and may not be one that a juror imagines or makes up to avoid carrying out an unpleasant duty.

By contrast, the defendant must prove any mitigating circumstances; however, the defendant only has to prove it by a preponderance of the evidence, that is by the greater weight of the evidence, which is a less demanding standard of proof than beyond a reasonable doubt. . . .

\* \* \*

The different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives the defendant the full benefit of any mitigating circumstance or circumstances. It is closely related to the burden of proof required.[20]

The court went on to explain that if the jury could not come to a unanimous decision, the sentence would be life.

When we view the penalty phase jury instructions in their entirety, we find that the trial court's charge to the jury clearly and accurately explained the respective burdens of proof and the presumption of life to which Eichinger was

**20.** Trial by Jury, 11/03/05, pp. 45–58.

entitled. *See Commonwealth v. Marinelli,* 910 A.2d 672, 682 (Pa.2006) (Opinion Announcing the Judgment of the Court).

Eichinger next argues that the trial court incorrectly admitted a victim impact statement which resulted in a sentence of death that was impermissibly based on passion and prejudice. Eichinger relies on this Court's decision in *Commonwealth v. Singley,* 582 Pa. 5, 868 A.2d 403 (2005), wherein we held that "the trial court is vested with the discretion to regulate the presentation of victim impact evidence and 'relief is always available to correct those situations where unduly prejudicial information is introduced which renders the sentencing process fundamentally unfair.'" *Id.* at 414 (internal citations omitted). Eichinger broadly asserts that the victim impact statements introduced non-statutory facts and circumstances along with arbitrary and impermissible factors that did not relate to the elements of the aggravating circumstances. He does not elaborate as to what specific language he finds to be prejudicial.

The Commonwealth also cites to *Singley* to demonstrate that the victim impact statements at issue here were much like the statements approved by this Court in that case. As in *Singley,* the testimony in this case referred to the consequences of the three murders. The father and mother of Heather and Lisa, who were also Avery's grandparents, gave brief statements about their loss and the impact that the murders had on Avery's surviving sister, Melody.

The trial court relied on *Singley's* holding that it is proper to admit evidence concerning the victim and the impact of the victim's death on the family. *Id.* at 414 (citing *Commonwealth v. Williams,* 578 Pa. 504, 854 A.2d 440, 445 (2004)).

In *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143 (2001), this Court set out clear guidelines for victim impact statements in death cases. We held that Pennsylvania jurisprudence favors the introduction of all relevant evidence during a capital sentencing proceeding and that our sentencing scheme does not limit this evidence in the penalty phase to only the information necessary to establish aggravating and

mitigating circumstances. *Id.* at 153. *See also* 42 Pa.C.S. § 9711(a)(2) and (c)(2). Further, we held that our trial judges are more than capable of overseeing the presentation of evidence so that overtly passionate, intentionally biased and inflammatory material is kept out of the courtroom. *Means,* 773 A.2d at 158.[21] Victim impact testimony is permissible when the Commonwealth establishes that the victim's death had an impact on the victim's family as opposed to presenting mere generalizations of the effect of the death on the community at large. Once this threshold has been met, the trial court has discretion over the testimony admitted. *Id.* See also *Commonwealth v. Williams,* 578 Pa. 504, 854 A.2d 440, 446 (2004).

When a court comes to a conclusion through the exercise of its discretion, there is a heavy burden to show that this discretion has been abused. *Paden v. Baker Concrete Construction, Inc.,* 540 Pa. 409, 658 A.2d 341, 343 (1995). It is not sufficient to persuade the appellate court that it might have reached a different conclusion, it is necessary to show an actual abuse of the discretionary power. *Id.* An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. *Id.* Absent an abuse of that discretion, we will not disturb the ruling of the trial court.

The record shows that Mr. Greaves testified to the close relationship he had with his two daughters and granddaughter. They shared a home together and Mr. Greaves talked about how his life has changed now that they are gone. Penalty Phase 11/2/05 pp. 199–208. Mrs. Greaves did not reside with the family, but she testified to the effect the

21. *Means* was an Opinion Announcing the Judgment of the Court. However, a majority of the Court agreed that trial courts should have substantial control over the manner in which victim impact testimony is presented to sentencing juries. See 773 A.2d at 160 (Saylor, J., concurring).

murders had on Heather's surviving daughter, Melody. Penalty Phase 11/2/05 pp. 200–204.

This testimony was not a broad generalization about the effects of the deaths on the community. Instead, it was a personal account which demonstrated the devastating impact the murders had on this family. Accordingly, this testimony was appropriate under our holding in *Means,* and Eichinger's claim fails.

Next, Eichinger contends that the trial court erred by permitting the use of all of his confessions during the penalty phase. He claims that the probative value of multiple confessions was outweighed by the unfair prejudice of repeated enumeration of his admissions after he already stood convicted. Eichinger argues that there is no evidentiary value in the Commonwealth's presentation of more than one of his cumulative confessions in order to prove aggravating factors. Pennsylvania Rule of Evidence 403 allows relevant evidence to be excluded if it is more prejudicial than probative. Eichinger maintains that the confessions were not relevant to any of the elements of the aggravating circumstances in the first place and that, further, their presentation to the jury necessarily had a prejudicial effect which resulted in a sentence based on passion and prejudice.

The Commonwealth maintains that this evidence was necessary to establish the facts of the murders and also to negate mitigating evidence presented by Eichinger concerning his mental state at the time of the crime.

The trial court relied on *Commonwealth v. Saranchak,* 544 Pa. 158, 675 A.2d 268 (1996), to admit the confessions. In *Saranchak,* this Court held that a capital sentencing hearing is not a sanitized procedure limited only to the evidence of aggravating circumstances. *Id.* at 275. The jury may evaluate the facts surrounding the murders. This allows the jury to understand the nature of the offense and the defendant's character. *Id.*

The trial court is correct. The Commonwealth has the burden of proving aggravating circumstances beyond a

reasonable doubt and, therefore, it must be permitted to present any and all additional evidence that may aid the jury in understanding the history and natural development of the events and offenses for which a defendant is being sentenced, as well as those for which he has been convicted, provided the evidentiary value of such evidence clearly outweighs the likelihood of inflaming the minds and passions of the jury. *Commonwealth v. Marshall,* 537 Pa. 336, 643 A.2d 1070, 1075 (1994). Contrary to Eichinger's assertion, the evidence presented is not limited to only the evidence necessary to prove specific aggravating factors, but includes any evidence that may aid the jury's appreciation of the events in question.

Our review of the record demonstrates that the Commonwealth used the confessions in accordance with these standards. The first statement admitted into evidence was Eichinger's false statement to the police concerning his whereabouts during the time of the murders of Heather, Lisa and Avery. This statement is probative to illustrate the natural development of events surrounding the confessions. The second statement describes the triple homicide. The third statement is a confession of the murder of Jennifer Still in 1999. The second and third statements are relevant to establish the facts of the murders.

The last statement reiterates the events described in the previous two statements, but it goes into greater detail concerning Eichinger's motives, the planning in which he engaged, including his decision to bring rubber gloves and the knife when he went to confront the women, the fact that he kept the knife he used to kill Jennifer and articles about the murder to remind him of his crime, the fact that he stabbed his victims in the stomach purposefully because he had heard that it was easier to puncture organs there than through the ribcage, and the actions he took to hide his crimes and turn police attention to other suspects. The Commonwealth used all of the available evidence to construct the story of the murders in a manner that clearly illuminated the circumstances for the jury without unfairly hammering home cumulative points.

· Furthermore, the Commonwealth presented this overarching story to allow the jury to consider Eichinger's mental state and his thought process each time he decided to respond violently to rejection by stabbing the women who refused him. This was essential to the Commonwealth's case as Eichinger introduced expert psychiatric testimony in mitigation to suggest that he was mentally unstable and unable to conform his conduct to the requirements of the law. Woven together with excerpts from Eichinger's journal, the confessions demonstrate the strategies Eichinger used to mislead the police as to his culpability and demonstrate the fact that he knew that he had committed a crime after he murdered Jennifer Still, and yet he chose to hide and nurse his unhealthy emotions until six years later when he was ready to wield his knife again. This evidence served to shed light on the brutal nature of Eichinger's offense and on his character.

All of the foregoing was relevant to the Commonwealth's case under our rule in *Saranchak*. We find that the trial court properly allowed the jury to hear all of Eichinger's confessions in the manner set forth because the evidentiary value was high and the Commonwealth took care to present the evidence as was necessary to develop the history of the case and to challenge evidence offered in mitigation without attempting to inflame the minds and passions of the jury.

In a similar vein, Eichinger submits that the trial court erred by permitting autopsy testimony during the penalty phase. Eichinger argues that although the autopsy report and photographs might be relevant to prove his specific intent to kill, that fact had already been proven during the guilt phase and the introduction of descriptions of the wounds and of photographs had no evidentiary value in proving aggravating factors, but instead could only serve to inflame the minds and passions of the jury. Eichinger relies on *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710, 716 (1994), for the proposition that photographs proffered simply to create an atmosphere of prejudice against the defendant are inadmissible.

The Commonwealth again turns to *Saranchak* to affirm its right to introduce evidence of the history and natural development of the facts. The Commonwealth notes that this is especially true here as this jury was empanelled only for the penalty phase after a stipulated bench trial, and therefore, did not hear any recitation of the facts during the guilt phase. The trial court agreed with the Commonwealth's position.

We find that the trial court acted within its discretion to admit the autopsy evidence. A photograph of a murder victim in a homicide trial is not *per se* inflammatory and the admissibility of these photographs is within the sound discretion of the trial court. *Saranchak*, 675 A.2d at 275. A photograph is admissible after application of a two-part test. The court must first determine if the photograph is inflammatory and then, if it is, the court must apply a balancing test to determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jury. *Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070, 1075 (1994). Eichinger does not single out the admission of specific photographs to contest, but our review of the record shows that the trial judge did engage in the appropriate evaluation of each photograph to determine whether or not it was inflammatory. Notes of Testimony, ("N.T.") 11/1/05, pp. 70–75. The trial court did find several of the photographs to be inflammatory, but judged them to be of greater evidentiary value than of prejudicial concern.

The record shows that the court was careful to guard against prejudice. There was a photograph of Avery which showed a color close-up of her face. The Commonwealth sought its introduction because of a bruise on her forehead. The trial court recognized the probative value of the image, but ruled that the depiction was too inflammatory to be published to the jury unless the majority of Avery's face was in some way covered. The Commonwealth, however, assured the court that it sought only to refer to the photograph, not to publish it to the jury. This exchange demonstrates that the trial court acted appropriately in carefully exercising its dis-

cretion as to the photographs. Further, the trial court cautioned the jury that some of the photographs might be unpleasant, but that the jury should not let their emotions be stirred to the prejudice of the defendant, but rather that the jury should view the evidence rationally and fairly. N.T., 11/1/05, p. 76. There is no evidence, as Eichinger suggests, that the Commonwealth sought to enter these photographs merely to prejudice the jury. Rather, they served to inform the jury as to the nature of Eichinger's acts. Any autopsy testimony that related to these photographs was also clearly admissible under *Saranchak* as necessary to explain the history and natural development of the facts of the case. The evidentiary decisions of the trial court are sound as they conform to our precedent and, therefore, Eichinger's claim fails.

 Eichinger next argues that the trial court erred when it denied him a right to allocution during the penalty phase by threatening to cross-examine him. Eichinger claims he wanted to take the stand in order to express his remorse, but the threat of cross-examination had a chilling effect which discouraged him from giving testimony. Eichinger claims that Pennsylvania Rule of Criminal Procedure 704(c)(1) clearly states that he has a right to allocution without cross-examination.[22] Alternatively, Eichinger argues that the trial court should have limited any cross-examination to the sincerity of his remorse under Pennsylvania Rule of Evidence 611(b) which generally limits the cross examination to the subject matter of the direct examination and matters affecting credibility. Eichinger claims that when the court denied his request to limit cross-examination, he was left with no choice but to say nothing at all, thereby depriving him of his most effective mitigating factor-remorse.

The Commonwealth responds by citing *Commonwealth v. Reyes*, 545 Pa. 374, 681 A.2d 724, 730–731 (1996), in which this

---

**22.** Pa.R.Crim.P. 704(c)(1) states, "At the time of sentencing, the judge shall afford the defendant the opportunity to make a statement in his or her behalf and shall afford counsel for both parties the opportunity to present information and argument relative to sentencing."

Court held that no right to allocution exists in a capital murder case.

The trial court, likewise, relied on the holding in *Reyes*. Further, the trial court colloquied Eichinger on this issue to insure that he was informed of the "pros and cons" of his choice not to testify and to insure that he remained comfortable with that decision. N.T., 11/02/05, pp. 223–224.

 The scope and the manner of cross-examination are within the sound discretion of the trial court and will not be overturned unless the court has abused that discretion. *Commonwealth. v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1317 (1996). Here, the trial court followed our precedent to rule that any statement made by Eichinger was subject to cross-examination. *Reyes*, 681 A.2d at 730–731 (citing *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846, 858 (1989)). Eichinger was certainly entitled to take the stand and express his remorse. This would have been relevant evidence in mitigation under 42 Pa.C.S. § 9711(a)(2). We have held that the jury in a capital case may consider any aspect of a defendant's character that the defendant proffers as a basis for a sentence less than death. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 851 (2003) (citing *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986)). But this is not a right unfettered. The jury must have the opportunity to assess the credibility of such evidence. *See Abu–Jamal*, 555 A.2d at 858. It is customary that a test of credibility be accomplished through cross-examination. *Id.* Therefore, as no right of allocution absent cross-examination exists, the trial court properly denied Eichinger's motion.

Eichinger's alternative argument that the trial court should have limited the scope of cross-examination likewise fails. The record demonstrates that Eichinger did not raise this alternative below. Further, if Eichinger had made the choice to testify, his counsel could have made an objection at the appropriate time if the Commonwealth sought to exceed the scope of cross-examination. *See,* Pa.R.E., 611(b). This claim merits no relief.

38

Eichinger then asserts that the trial court erred because it permitted the jury to consider 42 Pa.C.S. § 9711(d)(5) as an aggravating circumstance for the murder of Avery Johnson. Section 9711(d)(5) is an aggravating circumstance if "[t]he victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses." Eichinger claims that because Avery was only three years old, the Commonwealth bears the burden to prove by a preponderance of the evidence that Avery would have been competent to testify in a criminal prosecution. As no evidence was offered to prove her competence, the Commonwealth should have been barred from offering the aggravating factor. Eichinger sets forth the test from *Commonwealth v. Delbridge*, 578 Pa. 641, 855 A.2d 27 (2003), which requires the court to examine a young child for competency to insure that: (1) the witness is capable of expressing intelligent answers to questions; (2) the witness was capable of observing and remembering the event in question; and (3) the witness has an awareness of the duty to tell the truth. *Id.* at 39.

Eichinger asserts that the courts cannot presume that three-year-olds are competent to testify and therefore they are not the type of victims contemplated by Section 9711(d)(5), unless the Commonwealth can prove beyond a reasonable doubt that the victim would have met the test outlined in *Delbridge*.[23]

The Commonwealth cites *Commonwealth v. Marshall*, 571 Pa. 289, 812 A.2d 539, 542 (2002), wherein this Court upheld a capital murder conviction in which the jury found the aggravating factor under Section 9711(d)(5) and there was a two-year-old victim.[24]

---

23. Eichinger first claims that the appropriate standard is by a preponderance of the evidence, but upgrades the standard to beyond a reasonable doubt two paragraphs later. Brief for Appellant, p. 21.

24. We will not rely on *Marshall* as precedent for our analysis of the trial court's application of Section 9711(d)(5). A review of the direct appeal of *Commonwealth v. Marshall*, 537 Pa. 336, 643 A.2d 1070 (1994), not cited by the Commonwealth, demonstrates that the specific

The trial court considered Section 9711(d)(5) and ruled that the competence of the victim was not at issue; rather, the proper focus under the rule was the motivation of the defendant. The trial court considered the defendant's stated reason for killing Avery to determine that Section 9711(d)(5) was an appropriate aggravating factor to present to the jury.

The trial court has discretion over what aggravating factors are presented to the jury. *Commonwealth v. Buck*, 551 Pa. 184, 709 A.2d 892 (1998). The statutory provision under 42 Pa.C.S. § 9711(c)(1)(i) requires the trial court to instruct the jury to consider only aggravating circumstances for which there is some evidence. The case will be capital if the Commonwealth files a notice of at least one aggravating factor that is supported by any evidence. The trial court will determine what particular aggravating circumstances should be submitted for the jury's consideration before the jury retires to consider a verdict. *Buck*, 709 A.2d. at 896. We will not disturb this decision absent an abuse of discretion.

The trial court was correct to look to Eichinger's stated reasons for murdering Avery. In *Commonwealth v. Appel*, 517 Pa. 529, 539 A.2d 780, 784 n. 2 (1988), this Court held in reference to Section 9711(d)(5) that, "It is the fully formed intent ... to kill a potential witness that provides the animus upon which this particular aggravating circumstance rests," and that this intent must be demonstrated by "*direct* evidence." *Id.* (emphasis in original). The record in this case demonstrates that Eichinger told the police, "I can't even let the three-year-old identify me. I had known her since she was born and she knows my name. She could speak my name." [25] In his journal written in prison Eichinger describes the murder of Avery as follows:

> [Heather and I] struggled for a couple of minutes. Avery watching from behind me. I 'won' control of the knife and stabbed Heather. Then Avery said three words and I froze.

aggravating factor found in the death of the two-year-old was not under Section 9711(d)(5), but rather Section 9711(d)(10).

**25.** Pretrial Hearing, 9/15/05, CS–11, Exhibit A, p. 4.

Avery said, 'John killed Mommy.' I stopped. Heather at first said, 'Why?' and then looked at Avery and said, 'Avery call 911," then looked at me and said, 'She can do that, you know." I did not even think about that. I turned. I slashed Avery on the right side of the throat. Avery cried and put her hands to her neck and stood there as I turned back to Heather and stabbed her repeatedly. After a few seconds, Avery ran to the hallway again saying, "John killed Mommy." Heather was not dead, but I could not let Avery get Heather's cell phone.[26]

It is apparent from Eichinger's own words that he subjectively believed that Avery was capable of communicating his identity and his actions and that this belief motivated him to slash Avery's throat. Therefore, we will not disturb the lower court's ruling that allowed the Commonwealth to present Section 9711(d)(5) which creates an aggravating factor if the victim was a witness to a murder who was killed to prevent his or her testimony. Eichinger's report of the event makes it clear that Avery was a witness to murder and she died because she could speak his name.

Next, Eichinger contends that the trial court erred when it refused his request to list certain mitigating factors individually on the jury sheet pursuant to 42 Pa.C.S. § 9711(e)(8). Section 9711(e)(8), often referred to as the "catch-all" mitagator, allows, "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." *Id.* Eichinger requested the mitigating instructions of 1) good work record; 2) average in school; 3) conformed to prison life; 4) cooperated with authorities; 5) absence of a father; and 6) an Eagle Scout. Although the trial court read each of these factors in its instructions to the jury, these individual factors were not listed separately on the jury sheet.

Eichinger argues that the United States Supreme Court mandates that capital defendants be evaluated as

**26.** Commonwealth's Exhibit CS–8. This recitation of the facts is consistent with Eichinger's confessions to the police.

uniquely individual human beings under the Eighth Amendment. *Lockett v. Ohio,* 438 U.S. 586, 604–605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). This requires the sentencing jury to consider the possibility of "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death should be considered as a mitigating factor. *Lockett,* 438 U.S. at 604, 98 S.Ct. 2954. Further, any factors offered in mitigation must be given independent weight. *Id.* Eichinger then argues that any non-statutory factor offered in mitigation must reach the jury and it must be given equal weight to any of the statutory mitigating factors. But, the sentencing verdict slip used in Eichinger's case did not list each mitigator offered. It simply offered a "catchall" provision. Lumping these individual mitigating factors into one category on the verdict slip indicates to the jury that the non-statutory mitigating factors do not carry equal weight next to the statutory factors. Eichinger argues that under the Eighth Amendment, it is necessary that these factors be listed separately so they can be given appropriate weight.

The Commonwealth reproduces a copy of the Form for Jury Sentencing Verdict Slip provided by Pennsylvania Rule of Criminal Procedure 808 and asserts that the slip used in the present case was identical to the one required by the Rule.

The trial court also acknowledged that it used the slip mandated by Rule 808, citing *Commonwealth v. Miller,* 560 Pa. 500, 746 A.2d 592, 604 (2000), which held that a sentencing verdict form that did not specifically list mitigating evidence was proper when it was identical to the form mandated by the rule for death penalty cases.

Contrary to Eichinger's assertion, the holding of *Lockett* does not require that the verdict slip in capital cases list each non-statutory mitigating factor individually. *Lockett* was a plurality opinion. The viewpoint expressed in *Lockett* ripened into a holding of the United States Supreme Court in *Eddings*

*v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). *See Saffle v. Parks,* 494 U.S. 484, 490, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). We have held that *Lockett* and *Eddings* stand only for the proposition that a state may not bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial. *Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 776 (1998). Our statutory framework concerning the death penalty allows a defendant to present to the jury "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8). We have specifically held that we believe that the presentation of that mitigating factor to the jury as a part of the judge's charge satisfies the requirements of *Lockett. Commonwealth v. Lesko,* 509 Pa. 67, 501 A.2d 200, 207 (1985).

In the instant case the trial court charged the jury as to mitigating factors for each murder as follows:

In this case, under the Sentencing Code, the following matters, if proven to your satisfaction by a preponderance of the evidence, can be mitigating circumstances [concerning Heather Greaves, Lisa Greaves, or Avery Johnson]: One, the defendant was under the influence of extreme mental or emotional disturbance at the time of the murder. Two, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was substantially impaired at the time of the murder. Three, any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense; any other mitigating matter concerning the background, character and record of the defendant or the circumstances of his offense, such as, but not limited to, good work record; average in school; conform to prison life; cooperated with authorities; absence of his father; Eagle Scout; any other mitigating matter.... Please remember that the verdict slips are only a recording device. They do not supplant or replace my verbal instructions. You must follow my verbal instructions. As I told you earlier, you must unanimously agree on one of two general

findings before you can sentence the defendant to death. They are a finding that there is at least one aggravating circumstance and no mitigating circumstance, or a finding that there are one or more aggravating circumstances that outweigh any mitigating circumstance or circumstances. In deciding whether aggravating outweigh mitigating circumstances, do not simply count the number. Compare the seriousness and importance of the aggravating with the mitigating circumstances. If you all agree on either one of the two general findings, then you can and must sentence the defendant to death.[27]

The charge in this case, when read as a whole, meets constitutional muster. It properly incorporates each mitigating factor presented by Eichinger and further allowed the jury to consider any other mitigating factors it found beyond a preponderance of the evidence. The charge also correctly instructed the jury in its duty to consider all of the mitigating factors and weigh each one according to its seriousness and importance. Additionally, the trial court made it clear that the verdict slip was merely a recording device and that the jury was to take its instruction from the charge alone. Therefore, the charge meets the constitutional mandate of *Lockett*. It was not necessary that the non-statutory mitigators be listed separately on the verdict slip in order to meet this mandate. Eichinger has failed to prove that the trial court violated his constitutional rights and his claim must fail.

Finally, we have a duty to affirm the sentence of death unless it was a product of passion, prejudice, or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). We have engaged in a careful review of the trial record. This review leads us to conclude that the sentence of death was not a product of passion, prejudice, or any other arbitrary factor; rather, it was based upon the evidence admitted at trial. Further, this sentence complies with 42 Pa.C.S. § 9711(c)(1)(iv) which mandates a sentence of death when the factfinder finds one or more aggravating circumstances that outweigh any mitigating circumstances. Lastly, pursuant to

27. N.T., 11/03/05, pp. 47–56.

42 Pa.C.S. § 9711(h)(3)(ii), we find that the evidence was sufficient to support the aggravating circumstances the jury found when it imposed a sentence of death.

Accordingly, we affirm the verdict of first-degree murder and the sentence of death.[28]

Former Justice NEWMAN did not participate in the decision of this case.

Justice CASTILLE, SAYLOR, EAKIN and BAER and Justice BALDWIN join the opinion.

28. The Prothonotary of the Supreme Court is directed to transmit a full and complete record of the trial, sentencing hearing, imposition of sentence and the opinion and order of this Court to the Office of the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).