J-A16036-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JARROD CLARK VARNER | : | |
| | : | |
| Appellant | : | No. 1163 MDA 2020 |

Appeal from the Judgment of Sentence Entered August 13, 2020
In the Court of Common Pleas of Mifflin County Criminal Division at
No(s): CP-44-CR-0000275-2019

BEFORE: KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: SEPTEMBER 16, 2021**

Appellant Jarrod Clark Varner appeals the judgment of sentence entered by the Court of Common Pleas of Mifflin County after Appellant was convicted of unlawful possession of a controlled substance (heroin), possession of drug paraphernalia, and summary offenses.[1] Appellant asserts the trial court erred in denying his motion to suppress evidence confiscated from his vehicle during the course of a consent search. After careful review, we affirm.

After Appellant was charged in this case, he filed a motion to suppress evidence seized from his vehicle. While Appellant conceded the initial stop of his vehicle was lawful, he alleges that he was subjected to a second, unlawful

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Appellant purported to appeal from the order denying his pre-trial suppression motion. However, the appeal properly lies from the judgment of sentence. **See Commonwealth v. Pratt**, 930 A.2d 561, 562 n.1 (Pa.Super. 2007) (citation omitted). The caption has been amended accordingly.

seizure when the officers detained him to investigate matters unrelated to the initial stop without reasonable suspicion of criminal activity. As a result, Appellant asserts that his consent to the search of his vehicle was invalid as it was not given during a lawful police encounter.

The trial court held two suppression hearings at which the following facts were developed: on March 19, 2019, at approximately 8:00 p.m., Trooper Chad Snook was on patrol in Lewistown when he noticed a black Ford Mustang Shelby G.T. with an inoperable passenger side headlight. Notes of Testimony (N.T.), 10/1/19, 4-8. Trooper Snook initiated a vehicle stop, approached on foot, and observed the vehicle had an expired inspection sticker. *Id*. at 7-8.

Trooper Snook began conversing with the vehicle's driver, Appellant, and his female passenger, Keolani Elieisar. *Id*. at 6-7; N.T. Suppression, 12/10/19, at 19. Trooper Snook testified that it was "very obvious" that Appellant was nervous because his hands were shaking, his lip was quivering, he was very talkative, and had a worried demeanor. N.T., 10/1/19, at 11.

When Trooper Snook asked for Appellant's license and registration, Appellant identified himself as a veteran. Hearing Exhibit 1 ("MVR1") (Trooper Snook dashcam video along with bodycam audio). After Trooper Snook pointed out that Appellant's headlight was inoperable and his inspection sticker was expired, Appellant acknowledged these facts and indicated that he had just returned from the Harrisburg area, where he had been looking for a new vehicle, specifically, a Prius. N.T., 10/1/19, at 11; MVR1. Trooper Snook attempted to keep the conversation light by joking with Appellant as to why

he would want a Prius after having a Mustang. MVR1. Trooper Snook took Appellant's documents and returned to the patrol vehicle. MVR1.

Trooper Snook called for backup as it was protocol to do so for officer safety when conducting a stop of a vehicle with multiple occupants. N.T., 10/1/19, at 9. Corporal Mark Kirby responded to assist Trooper Snook within a few minutes of the initial stop. *Id*. at 10; MVR1.

At the suppression hearing, Trooper Snook testified that, before he stopped Appellant's vehicle, he had received intelligence information earlier that day from a member of the "vice unit" who reported that a driver in a black Mustang with a military license plate would be returning from the Harrisburg area and the driver would "get[s] out of different incidents and traffic stops based on his veteran status." N.T., 10/1/19, at 11-12, 24-25. Trooper Snook testified that once he pulled Appellant over for his inoperable headlight, he remembered the information given to him directly by the vice officer at the state police barracks just hours earlier on the same patrol shift (3 p.m. to 11 p.m.). *Id*. at 15, 22-24.

Corporal Kirby confirmed that he had received the same intelligence information from the vice officer from the "drug unit" and agreed that Appellant met the description of that driver. *Id*. at 40, 42; Hearing Exhibit 2 ("MVR2") (Corporal Kirby dashcam video along with bodycam audio). Neither trooper could testify at the suppression hearing as to where the vice unit officer obtained this intelligence information but Corporal Kirby indicated that the vice unit officer works with police informants to make controlled purchases

of drugs. N.T., 10/1/19, at 41. Corporal Kirby testified that he has received reliable information in the past from this particular officer. *Id*. at 41.

After Corporal Kirby arrived on the scene, he approached the vehicle on the passenger side while Trooper Snook ran Appellant's identification. Corporal Kirby briefly spoke with Appellant, who explained how he broke his headlight and indicated that he planned to have it repaired before obtaining a valid inspection certificate. MVR2.

Corporal Kirby then returned to Trooper Snook's patrol car, and shared his observation that Appellant was "freaking out" and looked like a "nervous wreck." MVR2. Corporal Kirby also noted that Appellant would not make eye contact with him. N.T., 10/1/19, at 65. Trooper Snook admitted at the suppression hearing that he did not complete a criminal record check of either occupant as he did not know how to do it from the patrol vehicle. *Id*. at 32.

Thereafter, the troopers decided to converse with the vehicle's occupants separately based on a number of factors. MVR1, MVR2; N.T. 10/1/19, at 10, 16-17, 43, 60. The troopers were concerned about Appellant's extreme nervousness, the information they received from the vice unit officer, the fact that Appellant had been traveling back from Harrisburg, and their disbelief of Appellant's story that he traveled a significant distance to look at a Toyota Prius. *Id*. Both officers noted that Harrisburg is a source city for drug trafficking and testified that "Harrisburg is a very large source of controlled substances that is coming through Mifflin County … and the surrounding areas." *Id*. at 10, 51.

Based on these observations, Corporal Kirby voiced suspicion that Appellant and Elieisar were in possession of a controlled substance and his concern that Elieisar was concealing it on her person. *Id*. at 10, 51; MVR1, MVR2. Corporal Kirby indicated through his experience in conducting numerous arrests and in his training in drug interdiction and trafficking, he learned that males often use female companions to hide controlled substances, which can be very small, as "law enforcement is predominantly male and that we are more reluctant to do a thorough search of them and that female officers aren't always available." N.T. 10/1/19, at 47, 50.

While Corporal Kirby spoke with Elieisar through the passenger side window, Trooper Snook asked Appellant to get out of the vehicle to answer some brief questions. MVR1. Appellant agreed and asked if he was in trouble to which Trooper Snook responded "no, man." MVR1. Trooper Snook again asked where Appellant was coming from and Appellant indicated that he was coming from a location past Harrisburg, where he was shopping for a vehicle. N.T. 10/1/19, at 18; MVR1. Trooper Snook noted that Appellant continued to appear agitated during their conversation. N.T. 10/1/19, at 18-19. Trooper Snook asked if Appellant was ok as he appeared to be "shaky, nervous, and chattery." MVR1. Appellant indicated that he was fine. MVR1.

Trooper Snook asked if Appellant had "anything in the vehicle that should not be in the vehicle"; Appellant responded "no." MVR1. Trooper Snook asked Appellant for consent to search his vehicle, and Appellant stated that he did have anything in the car. MVR1. Trooper Snook responded "Ok. I'm

asking you for consent to look. That's totally up to you. You just seem real nervous to me, chattery, and jittery. Is it all right [to search the car]?" Appellant responded "no." MVR1.

At that point, Trooper Snook stopped questioning Appellant and awaited Corporal Kirby, who in the meantime was speaking separately with Elieisar. MVR1. When Corporal Kirby asked Elieisar where she had traveled with Appellant that day, she indicated they went to Harrisburg to visit Appellant's friend, who she could not name or describe. MVR2. Corporal Kirby recalled Elieisar gave him vague answers, was "very nervous, [and] was fidgeting in her seat." N.T. 10/1/19, at 44. While Appellant had told both officers that he had just returned from car shopping, Elieisar denied going anywhere else on their trip besides Appellant's friend's apartment building. MVR2.

After recognizing that Appellant's and Elieisar's accounts of their whereabouts were inconsistent, Corporal Kirby approached Appellant to question him further. Corporal Kirby told Appellant pointed out to Appellant that he was shaking and his lip was quivering, and again asked Appellant where he had been traveling from. N.T. 10/1/19, at 45; MVR2. Appellant repeated his claim that they had gone to look for a vehicle and expressly denied stopping at a friend's house. MVR2.

When Corporal Kirby told Appellant that Elieisar had admitted they had traveled to meet Appellant's friend, Appellant's voice started wavering. N.T. 10/1/19, at 45, 47. Appellant asserted that he did not "understand why he was being questioned" to which Corporal Kirby responded that "something

was going here" based on Appellant's extreme nervousness as well as Appellant and Elieisar's conflicting statements about their visit to Harrisburg. MVR2. Appellant then stated that he went to see a friend who lived in a single-family home, not an apartment building as Elieisar had reported. MVR2.

Corporal Kirby then asked Appellant if he had ever consumed illegal drugs, to which Appellant initially responded "never." MVR2. Without further questioning, Appellant admitted he had smoked marijuana years ago and that he and Elieisar were on the Methadone program, as he was previously addicted to Percocet, which he had been prescribed for Post-Traumatic Stress Disorder (PTSD) that arose from his deployment to Iraq. MVR2.[2] Corporal Kirby thanked Appellant for his service, expressed sympathy, and acknowledged that it was understandable that Appellant might have a drug problem. MVR2.

Corporal Kirby then inquired whether there was anything illegal in the vehicle. MVR2. Appellant admitted he had a handgun in the center console which he was licensed to carry. MVR2. At that point, Corporal Kirby asked Appellant to search the vehicle, not knowing that Trooper Snook had already done so. MVR2. Appellant indicated that he would prefer that the vehicle not be searched and asked why a search was necessary. MVR2. Corporal Kirby pointed to Appellants' inconsistent statements and nervousness, and asserted there were multiple indicators that he would not discuss again. MVR2.

---

[2] The troopers admitted that neither Appellant nor Elieisar exhibited signs of impairment. N.T. 10/1/19, at 36.

Thereafter, Corporal Kirby emphasized that Appellant did not have to consent to the search and stressed that it was Appellant's right to decline the search. MVR2. However, Corporal Kirby suggested that he "would take other avenues" that would "prolong [Appellant's] night." MVR2. Appellant then indicated that he consented to the search. MVR2. Corporal Kirby repeated "I don't want to infringe on any of your rights. Are you telling me I can search [your vehicle]?" MVR2. Appellant again agreed to the search. MVR2.

Thereafter, Corporal Kirby asked Elieisar to exit the vehicle and retrieved the firearm from the center console where he found a blue wax paper baggie containing two red straws and a white powdery substance, which Corporal Kirby opined, based on his training and experience, was likely paraphernalia used to snort heroin. N.T. 10/1/19, at 48. After this discovery, Elieisar voluntarily surrendered her purse, which contained several unused blue baggies and a very small metal spoon which Corporal Kirby also found was indicative of snorting heroin. *Id*. at 49.

At that point, Corporal Kirby advised Appellant and Elieisar that he was going to call for a female officer to patdown Elieisar. *Id*. at 49. At that point, Appellant again became very nervous and directed Elieisar to give the officers "the dope," after which she pulled out a bag of suspected heroin from the front of her underwear. *Id*. at 49-50. At that point, the troopers placed Appellant and Elieisar under arrest. *Id*. at 51.

Appellant was subsequently charged with possession of a controlled substance (heroin), possession of drug paraphernalia, general lighting

- 8 -

requirements (headlamps), and operation of a vehicle without an official certificate of inspection.[3] Appellant filed an omnibus pretrial motion which included claims to suppress the evidence obtained from the stop. At the first of two suppression hearings, defense counsel indicated that he was unaware the officers would rely on intelligence information to justify their stop. In response, the prosecutor admitted that he had just recently been notified of this intelligence information and asked Trooper Snook why this information was not included in the police report. *Id*. at 12-13.

Trooper Snook admitted that he did not include any detail about the intelligence information he received prior to the stop of Appellant's vehicle in any of the police reports or the affidavit of probable cause out of concern for the safety of the vice officer, who works undercover. N.T. 10/1/19, at 13, 26, 60. Moreover, both Trooper Snook and Corporal Kirby testified that they believed that they already had the requisite suspicion to justify the interaction based on their own observations. *Id*. at 26, 60. At the suppression hearing, both Trooper Snook and Corporal Kirby specifically identified the vice officer by name and Trooper Snook indicated that this officer could be made available to testify in this case. *Id*. at 13, 22, 40.

On February 28, 2020, the trial court entered an order denying Appellant's suppression motion. Appellant filed a timely appeal and complied

___

[3] 35 Pa.C.S.A. §§ 780-113(A)(16), (32); 75 Pa.C.S.A. §§ 4303(a), 4703, respectively.

with the trial court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues in the Statement of Questions Involved portion of his appellate brief:

1. Whether the trial court committed an error of law in finding that Appellant was subject to a lawful investigative detention after the initial traffic stop, where the police officers had resolved the reasons for the initial stop and held Appellant at the scene to further investigate other unrelated conduct against Appellant's will without reasonable, articulable grounds for the continued stop.

2. Whether the trial court committed an error of law in failing to consider the veracity and reliability of the unnamed informant that the police officers allegedly relied upon as the basis for continuing to seize Appellant after the initial reasons for the traffic stop had been resolved.

3. Whether the trial court committed an error of law in finding that Appellant voluntarily gave valid consent to the vehicle search, where the police officers had resolved the reasons for the initial traffic stop, held Appellant against his will for additional questions about unrelated criminal allegations, and told Appellant that they would take measures to search his vehicle even if he refused after Appellant had refused to consent to the search three times.

Appellant's Brief, at 3-4.

In reviewing an appeal from the denial of a motion to suppress evidence, we are guided by the following standard of review:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing the ruling of a suppression court, we must consider only the evidence of the prosecution and so much of the evidence of the defense as remains uncontradicted when read in the context of the record. ... Where the record supports the findings of the suppression court, we are bound

- 10 -

by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Eichinger**, 591 Pa. 1, 915 A.2d 1122, 1134 (2007) (citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." **Commonwealth v. Gallagher**, 896 A.2d 583, 585 (Pa. Super. 2006). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. **In re L.J.**, 622 Pa. 126, 79 A.3d 1073, 1087 (2013).

**Commonwealth v. Bumbarger**, 231 A.3d 10, 15, (Pa.Super. 2020), *appeal denied*, 239 A.3d 20 (Pa. 2020).

Although Appellant concedes the officers' initial stop of his vehicle was justified due to his violation of the Vehicle Code as his car had an inoperable headlight, Appellant suggests that the officers' interaction transitioned into an illegal detention when the officers began questioning Appellant about matters unrelated to the initial basis for the stop when they had resolved all the issues relevant to the traffic violations. As such, Appellant claims his consent to the vehicle search was invalidated by the unlawful continued detention.

Our review of this claim is guided by the following principles:

The Fourth Amendment to the United States Constitution protects the right of people in this country to be secure against "unreasonable searches and seizures." U.S. Const. amend. IV. Thus, pursuant to the protections of the Fourth Amendment, before a police officer may conduct a search, he must generally obtain a warrant that is supported by probable cause and authorizes the search. **Schneckloth v. Bustamonte**, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A search warrant is not required, however, where a person with the proper authority unequivocally and specifically consents to the search. **Florida v. Jimeno**, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); **Commonwealth v. Strickler**, 563 Pa. 47, 757 A.2d 884, 888 (2000).

- 11 -

To establish a valid consensual search, the prosecution must first prove that the consent was given during a legal police interaction, or if the consent was given during an illegal seizure, that it was not a result of the illegal seizure; and second, that the consent was given voluntarily. **Strickler,** 757 A.2d at 888–901; *see also* **Florida v. Royer***,* 460 U.S. 491, 497, 501–07, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); **Dunaway v. New York***,*442 U.S. 200, 219, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). With regard to the prosecution's first burden of proof, we note that:

> Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

**Commonwealth v. Ellis***,* 541 Pa. 285, 662 A.2d 1043, 1047 (1995) (citations omitted). Thus, pursuant to the Fourth Amendment, a person may not be lawfully seized, either by means of an investigative detention or a custodial detention, unless the police possess the requisite level of suspicion.

**\*\*\***

Where a court finds that a person was illegally seized before he allegedly consented to a search, any evidence obtained as a result of the search must be excluded from the evidence against the accused as fruit of the poisonous tree, i.e., the unlawful seizure, unless the prosecution can establish that the alleged consent was not a result of the illegal seizure. **Strickler***,* 563 Pa. 47, 757 A.2d 884, 889–900; **see also Dunaway***,* 442 U.S. at 219, 99 S.Ct. 2248. If the court finds that an illegal seizure preceded an alleged consent but the consent was not caused by the illegal seizure or that a lawful interaction preceded an alleged consent, the court must then determine whether the prosecution has adequately proven that the consent was made voluntarily and was not the product of duress or coercion. **Strickler***,* 757 A.2d at 889, 901; **see also Mendenhall***,* 446 U.S. at 558, 100 S.Ct. 1870; **Royer***,* 460 U.S. at 497, 103 S.Ct. 1319.

*Commonwealth v. Reid*, 571 Pa. 1, 25–27, 811 A.2d 530, 544–45 (2002) (some footnotes omitted).

Appellant limited his appeal to claim that the trial court erred in denying his suppression motion as Appellant's consent to search his vehicle was not given during a legal police interaction. While Appellant raised three issues in his statement of questions involved section of his brief, he only presents one undivided argument section in which he solely focuses on the first issue: whether the officers subjected Appellant to an illegal investigative detention when they continued to question Appellant after resolving the reasons for the initial stop of his vehicle. We limit our discussion accordingly.[4]

In this case, the trial court found that, after the initial stop, the troopers subjected Appellant to an investigative detention supported by reasonable suspicion of criminal activity. The trial court reasoned that Appellant's "excessive talking, shaking hands, extreme nervousness, inconsistent stories for his trip to Harrisburg, his misrepresentation of prior drug use, and the information gathered at the police barracks warranted the officer to conduct an investigative detention." Trial Court Opinion, 2/28/20, at 4.

---

[4] Appellant did not develop any argument in his appellate brief to argue that his consent was not voluntary or that the officers exceeded the scope of his consent in searching the vehicle. To the extent that Appellant intended to raise such claims on appeal, they are waived for lack of development. *Commonwealth v. Antidormi*, 84 A.3d 736 (Pa.Super. 2014) (finding claim waived for lack of development when appellant failed to cite any legal authorities nor developed any meaningful analysis in support of the claim).

However, the trial court did not analyze the question of whether there was a clear, identified endpoint to the initial traffic stop or whether the initial stop seamlessly transitioned into a second, separate detention. The trial court did not assess whether the officers unlawfully extended the initial stop into an illegal seizure with their questioning of the vehicle's occupants.

It is undisputed that the troopers had resolved the basis for the initial traffic stop at the point that they asked Appellant to get out of his vehicle to question Appellant and Elieisar separately. Trooper Snook expressly admitted at the suppression hearing that the troopers had resolved their concerns related to the traffic violations before asking Appellant to get out of his vehicle and conceded that their further questioning had nothing to do with the traffic violations. N.T., 10/1/19, at 29.

We also observe that the initial stop did not have a clear endpoint as Trooper Snook had not returned Appellant's license and registration nor informed Appellant that he was free to leave when he asked Appellant to get out of the car. As such, the interaction did not shift back to a consensual encounter, but rather, seamlessly transitioned into a second investigative detention in which the troopers sought to ask additional questions about Appellant's travel to see if Appellant and his passenger would give corroborating statements regarding their whereabouts.

As such, the key issue is whether the troopers had the authority to extend the initial stop to question Appellant and his passenger on matters unrelated to the basis of the stop. In *Rodriguez v. United States*, 575 U.S.

348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), the Supreme Court discussed

the permissible scope of an officer's investigation during a traffic stop:

> A seizure for a traffic violation justifies a police investigation of that violation. "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' ... than to a formal arrest." *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), in turn citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). *See also Arizona v. Johnson*, 555 U.S. 323, 330, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, [*Illinois v.*] *Caballes*, 543 U.S. [405,] 407, 125 S.Ct. 834 [160 L.Ed.2d 842 (2005)] and attend to related safety concerns, *infra,* at 1619 – 1620. *See also United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *Ibid. See also Caballes*, 543 U.S., at 407, 125 S.Ct. 834. Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed. *See Sharpe*, 470 U.S., at 686, 105 S.Ct. 1568 (in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

*Rodriguez*, 575 U.S. at 354, 135 S. Ct at 1614.

More specifically, our state Supreme Court and the U.S. Supreme Court

have held that police officers "may conduct certain unrelated checks during

an otherwise lawful traffic stop … but may not do so in a way that prolongs

the stop, absent the reasonable suspicion ordinarily demanded to justify

detaining an individual." *In Int. of A.A.*, 649 Pa. 254, 266–68, 195 A.3d 896, 903–904 (2018) (quoting *Rodriguez*, 575 U.S. at 372, 135 S. Ct. at 1625).

Similarly, the U.S. Supreme Court has held that an officer may pursue questioning unrelated to the initial stop as "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788, 172 L. Ed. 2d 694 (2009) (quoting *Muehler v. Mena*, 544 U.S. 93, 100–101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005)).

As noted above, Trooper Snook expressly admitted that his tasks related to Appellant's traffic infractions had been completed before he asked Appellant to step out of the car for further questioning. Further, the troopers admitted that their subsequent questioning was completely unrelated to the traffic stop and was designed to uncover criminal conduct. As the troopers had accomplished the seizure's mission in addressing the initial traffic violation that had warranted the initial stop, the troopers' authority for initial stop ended before they directed Appellant to step out of his vehicle. *Rodriguez*, *supra*.

As such, we must determine whether, at that point in the interaction, the officers had reasonable suspicion that Appellant was engaged in criminal activity to justify a second, investigative detention.

With respect to an investigative detention, our courts have held that:

> [a] police officer may detain an individual in order to conduct an
> investigation if that officer reasonably suspects that the individual
> is engaging in criminal conduct. *Commonwealth v. Cook*, 558

Pa. 50, 735 A.2d 673, 676 ([Pa.] 1999). 'This standard, less stringent than probable cause, is commonly known as reasonable suspicion.' *Id*. In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. *In re D.M.*, 566 Pa. 445, 781 A.2d 1161, 1163 (2001). In making this determination, we must give 'due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience.' *Cook*, 735 A.2d at 676, *quoting Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, '[e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer.' *Cook*, 735 A.2d at 676.

*A.A.*, 649 Pa. at 266-68, 195 A.3d at 903-904 (quoting *Commonwealth v. Rogers*, 578 Pa. 127, 849 A.2d 1185, 1189 (2004)).

In *Rogers*, our Supreme Court concluded that the responding trooper had reasonable suspicion to continue to detain the defendant beyond the initial traffic stop, where the defendant was extremely nervous and shaking, gave vague answers to the trooper's questions, had conflicting paperwork for his car, and his vehicle contained laundry supplies and packaging tape, which the trooper knew from experience were used in packaging and distributing controlled substances. *Rogers*, 578 Pa. at 134, 849 A.2d at 1189–90.

While the Supreme Court acknowledged that there could be innocent explanations for all of these circumstances, "reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further[, but rather] requires a *suspicion* of criminal conduct that is reasonable based upon the facts of the matter." *Id*. at 134, 849 A.2d at 1190 (emphasis in original).

Similarly, in this case, the officers noticed that Appellant was unusually agitated during a routine traffic stop such that they indicated to each other at the scene that Appellant was "extremely nervous," "a nervous wreck," and was "freaking out." MVR1, MVR2. Both officers separately observed that Appellant was overly talkative, his hands were shaking, and his lip was quivering. Corporal Kirby observed that Appellant would not make eye contact with him, and the troopers testified that Appellant's nervous behavior did not subside during the stop.

In addition, the troopers recalled the intelligence information that they had been disseminated directly on the same patrol shift from a vice officer who reported that a male individual would be traveling from Harrisburg in a black Mustang and had relied on his veteran status in the past to get out of vehicle stops.

While the vice officer did not testify at Appellant's suppression hearing, the vice officer's intelligence information was corroborated when Trooper Snook observed Appellant's black Mustang Shelby G.T with an inoperable headlight and initiated a lawful traffic stop, during which Appellant admitted he was returning from Harrisburg and identified himself as a veteran. *See Commonwealth v. Jackson*, 548 Pa. 484, 490, 698 A.2d 571, 574 (1997) (citing *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (emphasizing that even an anonymous tip can justify a *Terry* stop "provided the tip is sufficiently corroborated by independent police work to give rise to a reasonable belief that the tip was correct"); *White*, 496 U.S. at

332, 110 S.Ct. at 2417 (finding anonymous tip reliable when the suspect matched the tip's description of the alleged criminal, left her house at a predicted time in a vehicle matching the tip's description, and traveled on the most direct route to the predicted destination).

The arresting troopers employed the information disseminated to them by their colleague officer to make their own independent assessment that criminal activity was afoot in that they believed Appellant was returning from Harrisburg in possession of illegal substances. Both of the troopers testified that Harrisburg was a source city for drug trafficking to Mifflin County and the surrounding areas. Appellant was predicted to be returning from Harrisburg and was traveling from Harrisburg when stopped by Trooper Snook. Both Trooper Snook and Corporal Kirby were concerned about Appellant's extreme nervousness and evasive eye contact. Further, both troopers expressed skepticism of Appellant's explanation that he traveled the considerable distance (more than 60 miles) to reach a dealership to look at a Toyota Prius.[5]

Viewing the totality of the circumstances, we conclude the officers had reasonable suspicion to continue to detain Appellant to investigate their

---

[5] We agree with Appellant that the trial court could not consider Appellant and Elieisar's contradictory statements about their whereabouts or Appellant's mischaracterization of his drug use in deciding whether the officers had reasonable suspicion to detain Appellant beyond the initial traffic stop. As these statements were elicited after the troopers had completed the purpose of their stop and authorization for the initial stop had ended, reliance on these statements in a reasonable suspicion analysis would be temporally misplaced. However, we find that, even without such admissions, the troopers demonstrated they had reasonable suspicion to continue to detain Appellant.

- 19 -

concerns that he was in possession of a controlled substance. As Appellant's consent to search his vehicle was given during a lawful police encounter, the trial court did not err in denying Appellant's suppression motion.

Judgment of sentence affirmed.

Judge Kunselman joins the memorandum.

Judge McCaffery concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2021