J-A26030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :       PENNSYLVANIA
            Appellee   :
  :
            v.   :
  :
CODY JOHN SAYLOR   :
  :
            Appellant   :   No. 576 EDA 2022

Appeal from the Judgment of Sentence Entered January 28, 2022
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0000554-2020

BEFORE:   BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:             **FILED DECEMBER 9, 2022**

Appellant, Cody John Saylor, appeals from the judgment of sentence entered in the Monroe County Court of Common Pleas, following his bench trial convictions for aggravated assault, two counts of simple assault, and recklessly endangering another person ("REAP").[1] We affirm.

In its opinion, the trial court set forth the relevant facts and procedural history of this case as follows.

> On September 15, 2019, officers from the Stroud Area Regional Police Department responded to a shooting at Threat Assessment Tactical Solutions ("T.A.T.S."). T.A.T.S. is an indoor "shoot house" facility where customers utilize simunition/UTM paint weapons ("UTM") to train in a "force on force" atmosphere while participating in different threat scenarios. Upon arrival, officers found Darin James

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2702(a)(1); 2701(a)(1), (2); and 2705, respectively.

McMahon ("Victim") with a gunshot wound to the neck laying on the floor of a garage area. The Victim was airlifted to Lehigh Valley Hospital where it was determined his injuries would leave him permanently paralyzed from the neck down. The shooter in the incident was identified as Appellant[.]

Subsequent investigation revealed Appellant was a role player at the T.A.T.S. facility in a "force on force" weapon training conducted by Rockwell Tactical. The training marked the second day of a two day "force on force" event held by Rockwell Tactical at T.A.T.S. Notably, Appellant's designation as role player indicated he was invited by the instructors due to his training and experience, and distinguished him from the students or participants. Appellant had extensive training in firearm use and safety and had participated in multiple firearm trainings prior to that day. After the morning training session, Appellant exchanged a UTM gun for his personal Glock 19 pistol before leaving the facility for lunch. After returning from lunch, Appellant ignored multiple safety checks and warnings and did not secure his Glock pistol in the designated lockers. As a result, Appellant did not exchange his Glock pistol for his assigned UTM gun before the afternoon training scenario and entered the "force on force" exercise with a live firearm.

The afternoon training scenario took place in a warehouse-type building at the T.A.T.S. facility. Inside the building, framed walls were used to form various rooms and impediments. In addition, vehicles were placed around the facility to simulate a "street" setting. Appellant was an active participant in the "force on force" simulation. After confronting the Victim in the simulation, Appellant discharged his live Glock 19 firearm into the Victim's neck, leaving the Victim permanently paralyzed from the neck down.

On March 18, 2020, Appellant was charged by Criminal Information with One Count of Aggravated Assault—Attempts to Cause Serious Bodily Injury or Causes Injury with Extreme Indifference, One Count of Simple Assault, and One Count of [REAP]. On July 14, 2020, Appellant waived formal arraignment. On September 30, 2020, after the [c]ourt granted leave to amend the Criminal

Information, the Commonwealth filed an Amended Criminal Information that included the three above-listed counts and added One Count of Simple Assault.

On August 3, 2020, Appellant filed an Omnibus Pretrial Motion seeking *habeas corpus* relief and dismissal of the Aggravated Assault charge. Appellant argued he did not act with the requisite malice to support the charge. On October 7, 2020, a hearing was held before the Honorable Jennifer Harlacher Sibum where the Commonwealth submitted evidence, including social media posts and several videos from the scene germane to the Omnibus hearing. At the conclusion of the hearing, Judge Sibum ordered counsel to file briefs, which were timely received. By Opinion and Order dated December 28, 2020, Judge Sibum denied Appellant's Omnibus Motion and found the Commonwealth established a *prima facie* case for the Aggravated Assault charge.

On May 22, 2021, Appellant filed a Motion for Bench Trial that stated, in relevant part, "Appellant is willing to stipulate to most or all of the facts in this case…as presented by the Commonwealth…the final verdict will turn entirely on interpretation of case law regarding malice." On June 4, 2021, Judge Sibum granted Appellant's Motion for Bench Trial noting the Commonwealth had no objection to same. On August 30, 2021, a bench trial was held before the Honorable Margherita Patti-Worthington wherein Appellant and the Commonwealth provided a "Stipulated Exhibit List and Stipulations of Counsel." At [the] bench trial, the sole evidence taken was the testimony of Appellant. At the conclusion of the non-jury trial, we ordered counsel to file briefs addressing whether evidence presented was sufficient to support the *mens rea* element of Aggravated Assault and the related charges. Both counsel timely filed briefs. On October 6, 2021, Appellant was convicted [of the above-mentioned crimes]. On January 28, 2022, [the court] sentenced Appellant to an aggregate period of incarceration of 6 to 24 months, less one day, to be followed by a period of probation of 1 year. Appellant did not file Post-Sentence Motions.

On February 18, 2022, Appellant timely filed his Notice of Appeal. On February 22, 2022, [the court] filed an Order

directing Appellant to file a Concise Statement pursuant to Pa.R.A.P. 1925(b).  On March 14, 2022, [the court] timely received Appellant's Concise Statement[.]

(Trial Court Opinion, filed April 1, 2022, at 1-4) (internal citations and footnotes omitted).

Appellant raises one issue for our review:

Whether the [trial] court erred in finding the evidence sufficient to convict [Appellant] of aggravated assault when [Appellant] did not act intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life?

(Appellant's Brief at 3).

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.  Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.  Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty.  Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

The Commonwealth may sustain its burden by means of wholly circumstantial evidence.  Accordingly, [t]he fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence.  Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced,

accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

***Commonwealth v. Sebolka***, 205 A.3d 329, 336-37 (Pa.Super. 2019) (quoting ***Commonwealth v. Franklin***, 69 A.3d 719, 722-23 (Pa.Super. 2013)).

Appellant initially concedes that he caused serious bodily injury to the victim, and that Appellant did so negligently. Appellant argues, however, that he did not act knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. Appellant claims the Commonwealth presented insufficient evidence of malice, which Appellant contends is the required *mens rea* for an aggravated assault conviction. Specifically, Appellant avers the evidence was insufficient to show that he acted with a reckless disregard of consequences. Appellant emphasizes that the relevant safety protocols were not followed by the instructor prior to the afternoon training session in which the incident occurred. Appellant stresses that his failure to follow the safety protocols was not intentional and was not accompanied by the reckless disregard of the consequences. Appellant insists he had no reason to believe that there was a risk of harm to the victim because Appellant was unaware that he was still carrying his live firearm. Appellant maintains he did not know he possessed his live firearm until he drew it and fired it during the scenario in which Appellant was supposed to be responding to victim in Appellant's role as "bad guy" for training purposes. Appellant

suggests the evidence was insufficient to establish that he "engaged in a sustained pattern of purposeful recklessness, knowing serious bodily injury was reasonably certain to occur, and consciously disregarded that risk, [such that] he could not have shown the reckless disregard of consequences that is necessary for a finding of malice and a conviction of aggravated assault." (*Id.* at 14).

Additionally, Appellant argues that he did not act with a mind regardless of social duty. Appellant emphasizes he was unaware that he had any social duty at the time of the incident because he was not aware that he was in possession of a live firearm. Appellant contends he could not have consciously disregarded a duty of which he was unaware. Appellant posits that "to consciously disregard the duty, he would have had to recognize the dangerous conduct, and with the benefit of time and reason, make the affirmative choice to proceed on the dangerous course of conduct." (*Id.* at 16). For these reasons, Appellant concludes the evidence was insufficient to sustain his aggravated assault conviction, and this Court must reverse the conviction. We disagree.

After a thorough review of the record, Appellant's brief,[2] and the relevant law, we agree with the trial court's thorough legal analysis as set forth in the trial court's opinion. (*See* Trial Court Opinion at 4-21). Therefore,

_____

[2] The Commonwealth did not file a responsive brief.

we adopt the trial court's reasoning as our own.[3]

Here, the trial court reasoned that Appellant received extensive tactical training in the use of maintenance of firearms; Appellant frequently participated as a role player in "force on force" training sessions; Appellant participated as a role player with Rockwell Tactical ten times over a two year period; Appellant acted as a qualified instructor at a master handgun class; Appellant had completed at least 350 hours of pistol, rifle, medical, and instructor training; and Appellant founded Primal Defense Training, a company offering private firearms training. (Trial Court Opinion at 15-16).

On the date in question, prior to the afternoon session, Appellant did not adhere to the required safety protocols when he failed to (1) remove his Glock firearm and store it in the designated locker; (2) retrieve his UTM gun in its distinct holster from the blue armory; (3) perform a self-check; (4) engage in a buddy check; (5) receive a hand frisk from the instructor; (6) check his UTM gun to ensure it was properly loaded; and (7) notice the difference in appearance between the Glock 19 and the UTM including the difference in color schemes and the weight differential of the fully loaded weapons. (*Id.* at 18). Appellant then entered the "force on force" exercise

---

[3] We note that the trial court relied on **Commonwealth v. McBride**, No. 3494 EDA 2016 (Pa.Super. filed Mar. 27, 2018), which is an unpublished decision from this Court. Under Pa.R.A.P. 126(b), this Court may rely on unpublished decisions from this Court filed **after** May 1, 2019 for persuasive value. Even without consideration of this case, however, we would still adopt the court's reasoning and reach the same result.

- 7 -

with his Glock 19 and shot Victim, who sustained serious injuries. "Appellant offered no credible explanation as to why he disregarded the above-discussed safety protocols and procedures." (*Id.*)

In light of this evidence, the trial court explained:

> Based on the foregoing, Appellant was a highly skilled and extremely trained firearms expert. By his own account, Appellant completed over 350 hours of training across 7 different schools over a 6 year period. Appellant not only participated as a role player and instructor for various trainings, but also founded his own business, Primal Defense Training, to further provide training and instruction based on his extensive experience. …Appellant's training and experience afforded him a familiarity with the required safety procedures attendant to a "force on force" training exercise. As such, in his capacity as role player and instructor, Appellant had a heightened social duty to protect his students from the extremely high risk that a live firearm discharging would result in death or serious bodily injury.
>
> In addition, Appellant exhibited an unbroken pattern of sustained recklessness leading to the shooting and resultant paralysis of the Victim. Appellant returned from lunch carrying a live Glock 19 firearm. Appellant entered the T.A.T.S. facility and walked directly past the safety storage lockers to his left. He was instructed to check his weapon and perform the required safety checks attendant to the afternoon training session. Despite this, Appellant failed to remove his firearm and store it in the required safety lockers.
>
> Moreover, Appellant failed to perform the required three-part check—self, buddy, instructor—despite having signed a waiver agreeing to do same, and despite having stored his firearm in the lockers multiple times the previous day and that morning. Further, Appellant failed to retrieve his UTM gun in its distinct holster from the blue armory, and failed to check his UTM gun to ensure it was properly loaded before entering the training. Finally, Appellant failed to notice the difference in appearance between the UTM gun and his Glock 19, failed to notice the weight differential between the

- 8 -

two guns, and failed to notice the substantially different holsters designated to each gun.

Further, Appellant's lack of explanation for his conduct suggests a total lack of awareness or diligence during the time period relevant to our review. Considering the extraordinary duty owed by a firearms operator to switch his live firearm for a UTM gun prior to a force o[n] force training, Appellant's silence on the germane time period implies exactly the kind of recklessness of consequences and a mind regardless of social duty contemplated by case law.

Due to his training and experience, Appellant was uniquely aware that the use of a live firearm in a training scenario would result in death or serious bodily injury to a fellow training participant. [E]ven assuming Appellant was unaware that he was carrying a live firearm, he was subject to repeated warnings sufficient to establish a reckless disregard of a known danger. Despite this, Appellant consciously disregarded an unjustified and extremely high risk by engaging in an unbroken pattern of sustained recklessness.

Appellant's course of conduct following his return from lunch until the start of the afternoon training session spanned in excess of 15 minutes. With each passing minute, Appellant continued a sustained and unbroken pattern of recklessness. Appellant had adequate time to calculate and reflect on his wholesale disregard of the mandated safety protocols. Had Appellant broken this chain of reckless conduct at any time prior to the shooting, this tragedy could have been avoided. …

\* \* \*

We believe this is a tragic case; however, Appellant engaged in an unbroken and sustained pattern of reckless conduct which demonstrated a conscious disregard of an unjustified and extremely high risk that his actions might cause death or serious bodily injury. In addition, Appellant's training, experience and trusted position as a role player in the "force on force" exercise amplified his social duty to the participants in the training. Even assuming Appellant was

- 9 -

unaware he was carrying a live firearm, he was subject to repeated warnings and safety briefings, and he knowingly signed a waiver indicating his awareness of same. Finally, Appellant's sustained reckless conduct caused him to use a deadly weapon on the vital part of the Victim's body. Taken together, Appellant's actions were sufficient to support finding malice under the facts and circumstances of this case.

(Trial Court Opinion at 19-21). Viewed in the light most favorable to the Commonwealth as verdict winner, the record supports the court's analysis that Appellant possessed the requisite *mens rea* to sustain his aggravated assault conviction. **See Sebolka, supra**. Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/9/2022

Filed
04/01/2022 5:53 PM
Court of Common Pleas

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **554 CR 2020** |
| | : | **576 EDA 2022** |
| **vs.** | : | |
| | : | |
| **CODY SAYLOR,** | : | |
| | : | |
| Defendant. | : | **APPEAL** |

### STATEMENT PURSUANT TO Pa. R.A.P. 1925(a)

We submit this statement in response to Cody Saylor's ("Appellant") appeal from this Court's judgment of sentence dated January 28, 2022. The relevant facts and procedural history of this case is as follows:

On September 15, 2019, officers from the Stroud Area Regional Police Department responded to a shooting at Threat Assessment Tactical Solutions ("T.A.T.S."). T.A.T.S. is an indoor 'shoot house' facility where customers utilize simunition/UTM paint weapons ("UTM") to train in a 'force on force' atmosphere while participating in different threat scenarios. Upon arrival, officers found Darin James McMahon ("Victim") with a gunshot wound to the neck laying on the floor of a garage area. The Victim was airlifted to Lehigh Valley Hospital where it was determined his injuries would leave him permanently paralyzed from the neck down. The shooter in the incident was identified as Appellant Cody Saylor.

Subsequent investigation revealed Appellant was a role player at the T.A.T.S. facility in a 'force on force' weapon training conducted by Rockwell Tactical. The training marked the second day of a two day 'force on force' event held by Rockwell Tactical at T.A.T.S. Notably, Appellant's designation as role player indicated he was invited by the instructors due to his training and experience, and distinguished him from the students or participants. Appellant had

extensive training in firearm use and safety and had participated in multiple firearms trainings prior to that day. After the morning training session, Appellant exchanged a UTM gun for his personal Glock 19 pistol before leaving the facility for lunch. After returning from lunch, Appellant ignored multiple safety checks and warnings and did not secure his Glock pistol in the designated lockers. As a result, Appellant did not exchange his Glock pistol for his assigned UTM gun before the afternoon training scenario and entered the 'force on force' exercise with a live firearm.

The afternoon training scenario took place in a warehouse-type building at the T.A.T.S. facility. Inside the building, framed walls were used to form various rooms and impediments. In addition, vehicles were placed around the facility to simulate a 'street' setting. Appellant was an active participant in the 'force on force' simulation. After confronting the Victim in the simulation, Appellant discharged his live Glock 19 firearm into the Victim's neck, leaving the Victim permanently paralyzed from the neck down.

On March 18, 2020, Appellant was charged by Criminal Information with One Count of Aggravated Assault – Attempts to Cause Serious Bodily Injury or Causes Injury with Extreme Indifference,[1] One Count of Simple Assault,[2] and One Count of Recklessly Endangering Another Person.[3] On July 14, 2020, Appellant waived formal arraignment. On September 30, 2020, after the Court granted leave to amend the Criminal Information, the Commonwealth filed an Amended Criminal Information that included the three above-listed counts and added One Count of Simple Assault.[4]

---

[1] 18 Pa. C.S.A. § 2702(A)(1).
[2] § 2701(A)(1).
[3] § 2705.
[4] § 2702(A)(2).

On August 3, 2020, Appellant filed an Omnibus Pretrial Motion seeking habeas corpus relief and dismissal of the Aggravated Assault charge. Appellant argued he did not act with the requisite malice to support the charge. On October 7, 2020, a hearing was held before the Honorable Jennifer Harlacher Sibum where the Commonwealth submitted evidence, including social media posts and several videos from the scene germane to the Omnibus hearing. At the conclusion of the hearing, Judge Sibum ordered counsel to file briefs, which were timely received. By Opinion and Order dated December 28, 2020, Judge Sibum denied Appellant's Omnibus Motion and found the Commonwealth established a *prima facie* case for the Aggravated Assault charge.

On May 22, 2021, Appellant filed a Motion for Bench Trial that stated, in relevant part, "Appellant is willing to stipulate to most or all of the facts in this case . . . as presented by the Commonwealth . . . [t]he final verdict [] will turn entirely on interpretation of case law [regarding malice]." *Def.'s Mot. for Bench Trial*, 5/22/2021, p. 3. On June 4, 2021, Judge Sibum granted Appellant's Motion for Bench Trial noting the Commonwealth had no objection to same. On August 30, 2021, a bench trial was held before the Honorable Margherita Patti-Worthington wherein Appellant and the Commonwealth provided a "Stipulated Exhibit List and Stipulations of Counsel."[5] At bench trial, the sole evidence taken was the testimony of Appellant. At the conclusion of the non-jury trial, we ordered counsel to file briefs addressing whether the evidence presented was sufficient to support the *mens rea* element of Aggravated Assault and the

---

[5] The Stipulated Exhibit List and Stipulations of Counsel contained fourteen (14) entries labelled one (1) through fourteen (14), including: "(1) Videos of Incident (two); (2) Stipulation that Victim, Darin McMahon, suffered "Serious Bodily Injury" as defined by 18 Pa. C.S.A. Sec. 2301. Definition, "Serious Bodily Injury" and that such injury satisfies the element of serious bodily injury in 18 Sec. 2702(A)(1) Aggravated Assault; (3) Transcript of Proceedings, October 7, 2020, before the Honorable Jennifer Harlacher Sibum; (4) Scene Diagram; (5) Interview of Mr. Saylor 9/23/19; (6) Miranda waiver of Mr. Saylor; (7) RTG LLC Waiver/Release; (8) Dynamic Force o[n] Force Handout – Information/Feedback handout; (9) Firearm license query and permit; (10) Evidence/property control log; (11) Scene photos (two); (12) Statement of Joshua Prince; (13) Instagram posts by Mr. Saylor (five images); (14) Facebook posts by Mr. Saylor (fifteen images) (hereinafter, "Com.'s Ex. 1, Entry___.").

related charges. Both counsel timely filed briefs. On October 6, 2021, Appellant was convicted of One Count of Aggravated Assault – Attempts to Cause Serious Bodily Injury or Causes Injury with Extreme Indifference,[6] Two Counts of Simple Assault,[7] and One Count of Recklessly Endangering Another Person.[8] On January 28, 2022, we sentenced Appellant to an aggregate period of incarceration of 6 to 24 months, less one day, to be followed by a period of probation of 1 year. *See* Sentencing Order, 1/28/22, pp. 1–2. Appellant did not file Post-Sentence Motions.

On February 18, 2022, Appellant timely filed his Notice of Appeal. On February 22, 2022, we filed an Order directing Appellant to file a Concise Statement pursuant to Pa. R.A.P. 1925(b). On March 14, 2022, we timely received Appellant's Concise Statement which contained the following alleged error: (1) this Court erred "in finding the [Appellant] guilty of Aggravated Assault, 18 Pa. C.S.A. 2702(a)(1) as the [Appellant] did not act intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; as such the evidence was insufficient to convict [Appellant] of this offense." *See* Statement of Errors, 3/14/22, p. 1.

## DISCUSSION

The sole issue before this Court is whether the evidence presented at trial was sufficient to establish the requisite malice necessary to support a conviction for Aggravated Assault. In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports the fact-finder's finding of all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Eichinger*, 915 A.2d 1122, 1130 (Pa.

---

[6] 18 Pa. C.S.A. § 2702(A)(1)
[7] § 2701(A)(1), (A)(2)
[8] § 2705

2007); *Commonwealth v. Spotz*, 759 A.2d 1280, 1283 (Pa. 2000). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014) (quoting *Commonwealth v. Sanders*, 627 A.2d 183, 185 (Pa. Super. 1993)). Moreover, the facts and circumstances need not be absolutely incompatible with the Appellant's innocence. *See Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 539 (Pa. Super. 1995). The question of any doubt is for the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *See id.*

In his Trial Brief, Appellant concedes, "there is minimal or no factual dispute in this matter . . . [the only issue presented is] what *mens rea* was present at the time of the incident that gave rise to these charges." *See Def.'s Tr. Br.*, 9/7/21, p. 1. (hereinafter, *Def.'s Br.*, p.___). Although Appellant "does concede he was negligent," he characterizes the issue before this Court as "[w]hether there was sufficient evidence of *mens rea* for conviction on the charge of Aggravated Assault." *Id.* at 3. The crux of Appellant's argument is that he did not possess the requisite malice required to support the Aggravated Assault charge because "his actions did not manifest extreme difference to the value of human life." *Id.* Specifically, Appellant argues "[he] did not know that he had a real gun . . . [and] no evidence [supports finding he] had any realization that he had a real gun prior to the shot being fired." *Id.* at 7.

Based on this assertion, Appellant avers that "malice only occurs when a societal duty is consciously disregarded." *Id.* By way of example, Appellant notes "[c]onsciously brandishing a real gun with people in the near vicinity . . . [or] consciously firing a shot in the direction of another person is in violation of social duty." *Id.* Proceeding from this construct of social duty,

5

Appellant asserts, "a criminal Appellant would have had to have been aware of a social duty and then have chosen to consciously disregard that duty . . . [in this case] Appellant was not aware of the social duty at [the time of the shooting] because he did not believe he had a real gun." *Id.* at 8. Thus, Appellant concludes, "[he] did not consciously brandish a real gun or consciously fire a real bullet," and as a result, lacked the requisite *mens rea* necessary to support his Aggravated Assault conviction. *Id.*

In response, the Commonwealth rests its arguments on the line of cases, discussed *infra*, that establish malice where a defendant exhibits a recklessness of consequences and a mind regardless of social duty." *See Com.'s Br.*, 9/7/21, p. 14. (hereinafter, *Com.'s Br.*, p.___). In this context, the Commonwealth argues, "the [Appellant] acted with a degree of recklessness that rose to the level of malice, as required by the charge of Aggravated Assault [because] malice can be inferred by a wanton or conscious disregard, where the conduct is such that one could reasonably anticipate that death or serious bodily injury would likely [] result." *Id.* at 13. In support, the Commonwealth cites a sustained and unbroken course of reckless conduct that, taken together, amounted to malice. Specifically, the Commonwealth notes it was reckless of Appellant to: (1) walk past the lockers where all weapons were to be stored; (2) to not check his Glock 9 mm firearm upon entry into the building; (3) to check and put on all his safety equipment, but not check the firearm in the holster on his hip and swap it out for the UTM; (4) to not check the UTM to confirm that it was fully loaded and ready to use in the simulation; and (5) to not heed and comply with the instruction of the lead instructor to check his weapon and get ready for the next scenario. *Id.* at 14. In addition, the Commonwealth notes the Appellant's extensive training and expertise in firearm use and handling and argues this fact warrants a heightened social duty.

Based on the foregoing, the Commonwealth contends Appellant's training and experience, coupled with an unbroken chain of sustained recklessness, constituted conduct "in conscious disregard of the consequences . . . [that disregarded] the unjustified and extremely high risk that his actions might cause death or serious bodily injury." *Id.* As a result, the Commonwealth concludes it has established Appellant's guilt beyond a reasonable doubt. We agree.

Aggravated assault arises when a person attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting an extreme indifference to the value of human life. 18 Pa. C.S. Sec. 2702(a)(1).[9] Here, the parties stipulate that the Victim suffered serious bodily injury sufficient to satisfy Sec. 2702(a)(1). As such, the sole issue before the Court is determining whether sufficient recklessness was established to support the Aggravated Assault charge.

To prevail on a theory of recklessness in a prosecution for aggravated assault, the Commonwealth must show that the assailant's recklessness rose to the level of malice, a crucial element of aggravated assault. *Commonwealth v. Bruce,* 916 A.2d 657 (Pa. Super. 2007), *appeal denied,* 593 Pa. 754, 932 A.2d 74 (2007). The malice that is required for aggravated assault is the same as that required for third degree murder. *Commonwealth v. Kling,* 731 A.2d 145, 147 (Pa. Super. 1999) (citation omitted). As such, the *mens rea* of malice respective to each of these offenses may be discussed concurrently. Malice consists of a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Commonwealth v. Pigg,* 571

---

[9] Although Appellant solely challenges his Aggravated Assault conviction, we note the recklessness required to sustain an Aggravated Assault charge is sufficient to sustain the REAP and Simple Assault charges at issue in this case. As such, our discussion of recklessness naturally includes the REAP and Simple Assault charges.

A.2d 438, 441 (Pa. Super. 1990), citing *Commonwealth v. Drum,* 58 Pa. 9, 15 (1868). We note the type of malice relevant to our review is whether Appellant showed a recklessness of consequences and a mind regardless of social duty.

Where malice is based on a reckless disregard of consequences, it is not sufficient to show mere recklessness; rather, it must be shown the Appellant consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury. *See Commonwealth v. Scales*, 648 A.2d 1205, 1207 (Pa. Super. 1994). As such, "[w]hen an individual commits an act of gross recklessness for which he must reasonably anticipate that death to another is likely to result, he exhibits that wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty which proved that there was at that time in him the state or frame of mind termed malice." *Commonwealth v. Malone*, 47 A.2d 445, 447 (Pa. 1946). In addition, malice may be inferred from the use of a deadly weapon on a vital part of the body. *Commonwealth v. Hinchcliffe,* 388 A.2d 1068, *cert. denied,* 439 U.S. 989, 99 S.Ct. 588, 58 L.Ed. 2d 663 (Pa. 1978); *see also Commonwealth v. Hare,* 404 A.2d 388, 391 (Pa. 1979) (malice may be found where the perpetrator "consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm"); *Commonwealth v. Wanamaker,* 298 Pa. Super. 283, 444 A.2d 1176 (1982) (same).

Cases interpreting malice based on a reckless disregard of consequences have established a theory of sustained recklessness where a defendant exhibits an unbroken pattern of sustained reckless conduct sufficient to imply malice under the facts and circumstances of the case. In *Commonwealth v. Kling*, the defendant engaged in a high-speed race with another driver up a curvy mountain road known as Scrub Ridge. 731 A.2d 145, 146 (Pa. Super. 1999). At the crest

8

of Scrub Ridge, the competitors began descending the mountain road. *Id.* As the *Kling* court

described:

> The first downside mile from the top of Scrub Ridge is riddled
> with eight substantial curves and five cautionary speed signs.
> Nevertheless, [defendant] maintained his excessive speeds, pulling
> away [and] disappearing into the blind curves. Through the second
> of these curves, [defendant] was on the wrong side of the road and
> nearly hit [a passing minivan]. In spite of this near collision,
> [defendant] neither slowed down nor took action to mitigate the
> obvious danger from his racing.
>
> Approaching the eighth major curve on the downslope, [defendant]
> swung into the no-passing zone and blew past two pickup trucks
> traveling in front of him. He then headed into the sharp double
> curve at nearly 70 m.p.h., crossed the center line again, and struck
> a vehicle driven by Helen Mellott. The collision, eight-tenths of a
> mile after [defendant] ran [the minivan] off the road, killed Ms.
> Mellott instantly and left her ten-year-old son with a ruptured
> artery to his liver.

*Id.* at 146-47.

On appeal, the defendant challenged the sufficiency of the evidence for his convictions of

third degree murder and aggravated assault. After a thorough review of relevant Pennsylvania

case law, the *Kling* court found, "a conviction based on malice is appropriate where evidence

demonstrates the element of *sustained recklessness* by a driver in the face of an *obvious risk of*

*harm* to his victims." *Id.* at 149 (emphasis added). The court defined sustained recklessness as a

pattern supported by the facts and circumstances of the case which exhibits:

> [T]he sustained, purposeful recklessness necessary to prove a
> knowing and conscious disregard that death or serious bodily
> injury was reasonably certain to occur . . . facts which allow a
> [factfinder] to [determine] the [defendant] had time and reason to
> calculate and reflect upon a deadly condition taking place, such
> that recklessness and malice exist.

*Id.* at 150. Thus, when evaluating whether a factual record supports a finding of malice, a court must determine whether the actor exhibited a pattern of sustained recklessness sufficient to imply malice under the facts and circumstances of the case.

Based on the foregoing standard, the *Kling* court addressed the facts as follows:

> [Defendant] was deliberately racing his high-powered car at speeds of 75–80 m.p.h. on a two and one-half mile stretch of a curvy mountain road. He was familiar with this road, having traveled it two to three times per week for over a year prior to the crash. He passed five cautionary signs warning him to slow down around the treacherous curves. In spite of these warnings, [defendant] proceeded at high rates of speed and, cutting the curves in order to negotiate the turns, he nearly hit [a minivan] driving in the opposite lane of travel. Without a doubt, the aggregate of these circumstances plainly warned [defendant] his conduct was nearly certain to result in a serious or fatal disaster. Nevertheless, he consciously disregarded this awareness and continued his race for eight-tenths of a mile after running [the minivan] off the road. Illegally passing two pick-up trucks, sustaining his reckless and malicious conduct, [defendant] sped into a dangerous double blind curve where he smashed into the victims.
>
> . . . [Defendant] had adequate time to calculate and reflect upon the consequences of his reckless conduct, thus rendering the choice to continue it malicious . . . [defendant] chose to play Russian roulette with the other drivers on Scrub Ridge. By speeding through the curves, he pulled the trigger four or five times with one near miss; on the last pull, however, he seriously injured a young boy and killed the boy's mother. This conduct exhibited the sustained recklessness, in the face of warnings, necessary to prove a "knowing and conscious disregard that death or serious bodily injury was reasonably certain to occur." We therefore uphold [defendant's] convictions for third degree murder and aggravated assault.

*Id.*

Notable to our review, the *Kling* court emphasized that the defendant: (1) had familiarity with the road; (2) failed to heed multiple cautionary signs; and (3) had adequate time to calculate and reflect on his actions. Thus, reckless conduct aggregates over time and is amplified by a

defendant's specific knowledge or familiarity with the conduct in question. As such, *Kling* informs our reading of "a mind regardless of social duty" – specifically, *Kling* supports the proposition that the social duty element is fixed relative to the life experience a defendant possesses with the conduct giving rise to the recklessness determination.

Also instructive is *Commonwealth v. Urbanski*, 627 A.2d 789 (Pa. Super. 1993), where a drunk driver, despite pleas from his wife to slow down and stop driving erratically, caused a collision which resulted in a fatality. In upholding the third degree murder conviction, our Superior Court explained:

> [T]he properly admitted trial testimony reveals a dangerously high blood alcohol level and a clear road surface combined with erratic driving and repeated refusals to give up the wheel. [Defendant] was or should have been aware of the danger that could result from driving so fast and so recklessly, especially after having had so much to drink. *Even if he was not aware, his wife repeatedly reminded him of the danger and asked many times if she could drive the car.* But [defendant] recklessly disregarded her pleas and the probability of a tragic result. His conduct in the car was the very type of conduct that the definition of malice describes.

*Id.* at 793–94 (emphasis added). Similar to *Kling*, the defendant in *Urbanski* was given multiple warnings and had the opportunity to terminate his reckless conduct. Importantly, the *Urbanski* court made clear that, even if defendant was unaware of his reckless conduct, the repeated warnings offered by his wife were sufficient to establish reckless disregard of a known danger. By ignoring clear warnings, the defendant's reckless conduct amplified over time and shifted from mere recklessness to the kind of sustained recklessness sufficient to sustain a third degree murder conviction.

Likewise, in *Commonwealth v. Scales*, 648 A.2d 1205 (Pa. Super. 1994), a reckless motorist was driving a heavy and high-powered vehicle at excessive speeds through a crowded residential neighborhood where children were playing in the streets and on the sidewalks. The

11

defendant ignored a stop sign, almost colliding with a vehicle at an intersection. When a bystander told him to slow down, he responded with 'shut up.' Without ever braking, the defendant sideswiped another car, swerved onto a curb, and ran into a large planter which was pushed into two children, crushing one of them to death. On review, the Superior Court affirmed the jury's finding of third degree murder, holding malice could be inferred by the driver's sustained disregard for the lives and safety of people and vehicles in his path, evidenced by his failure to slow down despite warnings to do so, and his refusal to apply the brakes upon sideswiping another automobile and swerving onto the sidewalk. *Id.* at 1208. The Superior Court noted:

> *When the actor so far crosses the line of reasonableness, concern for the safety of others and refuses to heed cautionary calls to desist, malice must be implied.* Any person who attempts to emulate the driving patterns exhibited in any of the 'French Connection,' 'Smokey and the Bandit' or 'Beverly Hills Cops' films on city streets crowded with children and others, the predictable victims of the irrational behavior, cannot escape having malice implied to his actions. Motor vehicles still outdistance firearms as the most dangerous instrumentality in the hands of irresponsible persons in our society today.

*Id.* at 1209 (emphasis added).

Reading *Kling*, *Urbanski* and *Scales* together establishes that, where a defendant has a social duty, a sustained pattern of recklessness at odds with that duty implies malice. In addition, the social duty owed by a defendant is case specific and turns: (1) on the life experience of the defendant; and (2) the type of conduct at issue. In other words, the social duty owed by an individual is relative to the life experience that individual has with the reckless conduct at issue. In addition, the type of conduct at issue, and the dangerousness of the conduct, is directly correlated to the degree of social duty owed. For example, operating a motor vehicle or possessing and discharging a firearm are inherently dangerous activities that heighten the degree

12

of social duty owed. Thus, recklessness is amplified both where an individual has significant experience with the conduct at issue, and where the conduct is inherently dangerous.

With the above principles in mind, we next turn to cases addressing the alleged accidental discharge of a firearm. In *Commonwealth v. Seibert*, the adult defendant entertained five teenage youths at his residence and provided beer, Valium and marijuana. 622 A.2d 361, 364 (Pa. Super. 1993). Over a fifteen minute period, defendant brandished a firearm, repeatedly removed and replaced the ammunition clip, and pointed the gun at his guests despite their objection. *Id*. Following this display, defendant placed the firearm on a shelf. *Id.* A "couple of hours" later the defendant returned, retrieved the firearm, walked over to the victim, shot him in the head and exclaimed, "I shot him. I can't believe I shot him." *Id.* In the aftermath, defendant devised a fictitious plan to assign blame on two non-existent intruders; however, the ruse quickly collapsed under scrutiny. *Id.* At trial, defendant asserted his belief that the gun was not loaded, that he left the gun with the clip removed, and that the deadly discharge was accidental. *Id.* Despite this, defendant was found guilty of third degree murder.

On appeal, the defendant argued the evidence did not establish the malice required for third degree murder. Defendant argued the evidence established poor judgment, but not the knowledge required to establish malice, and that the trial court erred in finding malice "where there was recklessness of consequences *unaccompanied* by wickedness of disposition, hardness of heart, cruelty and mind regardless of social duty." *Id.* at 365 (emphasis added).

Noting malice may be inferred from the use of a deadly weapon on a vital part of the body, the *Seibert* court continued:

> When an individual commits an act of gross recklessness for which he must reasonably anticipate that death to another is likely to result, he exhibits . . . [a] recklessness of consequences, and a mind regardless of social duty which proved that there was at that time

in him the state or frame of mind termed malice . . . malice may be [implied] where the actor consciously disregard[s] an unjustified and extremely high risk that his actions might cause death or serious bodily harm.

*Id.* The *Siebert* court continued, "the Commonwealth's evidence that [defendant] and the decedent were friends does not prove [lack of malice]; the [] friendship with the decedent does not prove [defendant's] recklessness did not reach the [sufficient] level of malice." *Id.* As such, the court found malice was established by the use of a deadly weapon on a vital part of the victim's body coupled with a sustained pattern of recklessness in handling the firearm that evidenced a conscious disregard for an unjustified and extremely high risk that said actions might cause death or serious bodily injury. Likewise, *Siebert* established that malice does not require evidence of hatred, spite, or ill-will; rather, it may be founded solely upon evidence of recklessness of consequences and a mind regardless of social duty.

Finally, in the non-precedential decision *Commonwealth v. McBride*, the defendant picked up a friend's handgun and admired the gun's weight and feel. 2018 WL 1476276 (Pa. Super. 2018). Moments later, the victim approached, defendant raised the firearm to the victim's head and the gun discharged, killing the victim. *Id.* at *1. After bench trial, defendant was found guilty of Third Degree Murder, Aggravated Assault and related charges. *Id.* at *2. On appeal, the defendant argued he did not know the gun was loaded, that he was a close friend of the victim, and that he was in shock following the discharge of the firearm. *Id.* at *3. Based on this, the defendant asserted the Commonwealth failed to establish the requisite malice to support the Third Degree Murder and Aggravated Assault charges.

The *McBride* court first noted malice may be inferred where the defendant consciously disregards an unjustified and extremely high risk that his actions might cause death or serious bodily injury. *Id.* at *5. Likewise, the court noted malice may be inferred from the use of a

14

deadly weapon on a vital part of the victim's body. *Id.* The court found that, standing alone, the use of a live firearm on a vital part of the victim's body was sufficient to establish malice. *Id.* In addition, the court found, "malice was established, as [defendant] acted with recklessness of consequences and a mind regardless of social duty when he decided not to check the gun to ensure that it was not loaded before he aimed at the victim's head [and fired]." *Id.* The *McBride* court clarified that, "[w]hile [defendant] may have been friends with the victim, aided in seeking medical assistance after the shooting, and did not demonstrate hatred, wickedness, or ill will, his actions did meet the other categories included in malice." *Id.* Thus, in *McBride* the use of a deadly weapon on a vital part of the victim's body, coupled with a recklessness of consequences and a mind regardless of social duty was sufficient to establish the requisite malice.

After a review of the relevant case law, five important principles emerge. First, malice does not require evidence of hatred, spite, or ill-will; rather, it may be founded solely upon evidence of recklessness of consequences and a mind regardless of social duty. Second, a pattern of sustained recklessness is sufficient to imply malice. Third, even where a defendant is unaware of his reckless conduct, repeated warnings from a third party are sufficient to establish a reckless disregard of a known danger. Fourth, the social duty owed by a defendant is case specific, turns on the life experience of the defendant, and recklessness is amplified proportionally to this analysis. Finally, malice may be inferred from the use of a deadly weapon on a vital part of the body.

In this case, the evidence presented at trial, viewed in the light most favorable to the Commonwealth, established the following: Prior to the incident in question, Appellant received extensive tactical training in the use and maintenance of firearms, including both actual and simulated firearms. Com.'s Ex. 1, Entry 3, p. 7-8. Moreover, Appellant frequently participated as

15

a role player in 'force on force' training sessions – a position that was accompanied by compensation or free training, and one that occupied an intermediate space between student and instructor. Com.'s Ex. 1, Entry 5, p. 8. Appellant participated as a role player with Rockwell ten (10) times over a two year period. *Id.* at 14. Appellant also acted as a qualified instructor at a master handgun class. Com.'s Ex. 1, Entry 3, pp. 41-42. By his own account, Appellant "completed at least 350 hours of pistol, rifle, medical, and instructor training across 7 different schools over the past 6 years and still counting." Com.'s Ex. 1, Entry 14. In addition, Appellant founded Primal Defense Training, a company offering private firearms training with a motto, "aim to avoid the fight, train to win it." *Id.*

On September 15, 2019, Appellant participated in a 'force on force' training exercise conducted by Rockwell Tactical at the T.A.T.S. facility. Com.'s Ex. 1, Entry 3, p. 43. Appellant was acting in the capacity of role player. *Id.* Appellant participated in the training drills and provided instruction and guidance to the students attending the training. *Id.* at 43-44. There were two exercises that day, one in the morning and a second in the afternoon. *Id.* at 16-18.

Prior to the start of the morning exercise, the instructor James Murr ("Murr") discussed accountability with Appellant and the students and had all participants sign safety waivers. Com.'s Ex. 1, Entry 7. Included in the waiver was the requirement that no firearms were allowed in the training area. *Id.* In addition, the waiver indicated all participants would engage in a self pat-down, a buddy pat-down, and an instructor pat-down prior to entering the training area. *Id.* Finally, the waiver made clear that, "Everybody is a safety officer." *Id.* One of the students present was the Victim, Darin McMahon. Appellant and the Victim had participated in previous trainings together, but were not social friends and had no relationship outside the Rockwell training. Com.'s Ex. 1, Entry 5, p. 46.

Following this, Murr discussed the Rockwell policy on live firearms brought to the facility and stated all firearms must be stored in a series of metal lockers inside the T.A.T.S. facility. Com.'s Ex. 1, Entry 3, pp. 16-18. The lockers were located in an area directly adjacent to the T.A.T.S. building entrance. *Id.* All participants passed the lockers upon entering the facility and Murr noted there were no exceptions to this rule. *Id.* After this clear admonition, Murr instructed all participants to disarm themselves, then required all students engage in a buddy check. Next, Murr administered a hand frisk to every student prior to the training start. *Id.* Finally, Murr required all participants to equip themselves with safety gear including a full coverage face mask. *Id.*

To engage in the training, Appellant was required to store his live firearm and equip himself with a UTM. *Id.* at 27. The UTMs were held in a specific room referred to as the blue armory. *Id.* at 31. A UTM is a realistic training gun designed to look and feel similar to a real firearm. *Id.* at 27. However, the UTM is specifically designed to have different identifiers to show it is not a real firearm, including a distinctive blue paint application, a different look or aesthetic, and certain 'feel' characteristics that would be familiar to an individual trained in firearms. *Id.* In addition, a UTM shoots a small plastic capsule filled with paint instead of a live round. *Id.* Moreover, Appellant kept his UTM in a separate and distinct holster in order to distinguish the UTM from his Glock 19. Com.'s Ex. 1, Entry 5, pp. 29-30. The holsters were different in appearance and design.

Following the morning session, Appellant left the T.A.T.S. facility and purchased lunch at a nearby McDonalds. Consistent with his usual practice, Appellant exchanged his UTM for his live Glock 19 firearm and carried his Glock firearm when he went to lunch. Com.'s Ex. 1, Entry 5, p. 9. Upon his return, Appellant was instructed by Murr to check his weapon and prepare for

the next round of training scenarios. In preparation, Appellant donned safety equipment including the mandated face mask, a hooded sweatshirt and gloves. Despite this, Appellant failed to: (1) remove his Glock firearm and store it in the designated locker; (2) retrieve his UTM gun in its distinct holster from the blue armory; (3) perform a self-check; (4) engage in a buddy check; (5) receive a hand frisk from Murr; (6) check his UTM gun to ensure it was properly loaded; and (7) notice the difference in appearance between the Glock 19 and the UTM including different color schemes and the weight differential of the fully loaded weapons. Following this course of conduct, Appellant entered the afternoon training exercise with his live Glock 19 firearm. *Id.* at 48-49. In the course of the 'force on force' exercise, Appellant shot Darin McMahon in the neck with his Glock 19 causing the Victim to be paralyzed from the neck down. Com.'s Ex. 1, Entry 3, pp. 37-38. Appellant dropped his Glock 19 on the ground, where it was later recovered by law enforcement officers. *Id.*

At bench trial and in his interview with Detectives Dobson and Transue, Appellant offered no credible explanation as to why he disregarded the above-discussed safety protocols and procedures. In fact, Appellant offered no explanation whatsoever for the time period spanning his return from lunch and running until the time the tragic shot was fired. For example, in his interview with the Detectives, Appellant's only statement about the relevant time period was, "I always [carried my concealed live firearm to lunch]. I went to lunch . . . Had lunch. We came back. We had a discussion about the previous events . . . things we did before lunch . . . We had a mental discussion about what happened . . . [then] [w]e went into the facility and we started to set up the next scenario." Com.'s Ex. 1, Entry 5, pp. 9-10. Detective Transue sensed this explanation lacked a key detail and followed-up, "I'm not trying to be a jerk or anything . . . but was there anything going on in your life that may have made you forgetful that day when you

18

came back from lunch . . . You know sometimes we make mistakes because we have stresses going on outside." *Id.* at 38. To this, Appellant shook his head no and responded, "I understand. I understand. Not that I can recall." *Id.* at 38-39.

Based on the foregoing, Appellant was a highly skilled and extensively trained firearms expert. By his own account, Appellant completed over 350 hours of training across 7 different schools over a 6 year period. Appellant not only participated as a role player and instructor for various trainings, but also founded his own business, Primal Defense Training, to further provide training and instruction based on his extensive experience. Like the defendant in *Kling*, Appellant's training and experience afforded him a familiarity with the required safety procedures attendant to a 'force on force' training exercise. As such, in his capacity as role player and instructor, Appellant had a heightened social duty to protect his students from the extremely high risk that a live firearm discharging would result in death or serious bodily injury.

In addition, Appellant exhibited an unbroken pattern of sustained recklessness leading to the shooting and resultant paralysis of the Victim. Appellant returned from lunch carrying a live Glock 19 firearm. Appellant entered the T.A.T.S. facility and walked directly past the safety storage lockers to his left. He was instructed to check his weapon and perform the required safety checks attendant to the afternoon training session. Despite this, Appellant failed to remove his firearm and store it in the required safety lockers.

Moreover, Appellant failed to perform the required three-part check – self, buddy, instructor – despite having signed a waiver agreeing to do same, and despite having stored his firearm in the lockers multiple times the previous day and that morning. Further, Appellant failed to retrieve his UTM gun in its distinct holster from the blue armory, and failed to check his UTM gun to ensure it was properly loaded before entering the training. Finally, Appellant failed to

19

notice the difference in appearance between the UTM gun and his Glock 19, failed to notice the weight differential between the two guns, and failed to notice the substantially different holsters designated to each gun.

Further, Appellant's lack of explanation for his conduct suggests a total lack of awareness or diligence during the time period relevant to our review. Considering the extraordinary duty owed by a firearms operator to switch his live firearm for a UTM gun prior to a force or force training, Appellant's silence on the germane time period implies exactly the kind of recklessness of consequence and a mind regardless of social duty contemplated by case law.

Due to his training and experience, Appellant was uniquely aware that use of a live firearm in a training scenario would result in death or serious bodily injury to a fellow training participant. Like the defendant in *Urbanski*, even assuming Appellant was unaware that he was carrying a live firearm, he was subject to repeated warnings sufficient to establish a reckless disregard of a known danger. Despite this, Appellant consciously disregarded an unjustified and extremely high risk by engaging in an unbroken pattern of sustained recklessness.

Appellant's course of conduct following his return from lunch until the start of the afternoon training session spanned in excess of 15 minutes. With each passing minute, Appellant continued a sustained and unbroken pattern of recklessness. Appellant had adequate time to calculate and reflect on his wholesale disregard of the mandated safety protocols. Had Appellant broken this chain of reckless conduct at any time prior to the shooting, this tragedy could have been avoided. Instead, Appellant chose to play Russian Roulette with the students that relied on his experience and expertise as a role player and instructor.[10]

---

[10] We note that, even assuming Appellant had no prior experience with firearms, we would not hesitate to reach the same conclusion.

In addition, we note *Seibert* and *McBride* establish that, in a case involving the alleged accidental discharge of a firearm, malice may be inferred from the use of deadly weapon on a vital part of the body. Here, we believe Defendant did not have knowledge that he was using a firearm – a fact that distinguishes this case from *Seibert* and *McBride*. However, Defendant's recklessness of consequence and a mind regardless of social duty caused his use of a deadly weapon on a vital part of the Victim's body. As such, although not central to our holding, we note Defendant's use of a deadly weapon, caused by a chain of unbroken reckless conduct, is sufficient to raise an inference of malice in this case.[11]

We believe this is a tragic case; however, Appellant engaged in an unbroken and sustained pattern of reckless conduct which demonstrated a conscious disregard of an unjustified and extremely high risk that his actions might cause death or serious bodily injury. In addition, Appellant's training, experience and trusted position as a role player in the 'force on force' exercise amplified his social duty to the participants in the training. Even assuming Appellant was unaware he was carrying a live firearm, he was subject to repeated warnings and safety briefings, and he knowingly signed a waiver indicating his awareness of same. Finally, Appellant's sustained reckless conduct caused him to use a deadly weapon on the vital part of the Victim's body. Taken together, Appellant's actions were sufficient to support finding malice under the facts and circumstances of the case.

For the foregoing reasons, We believe Appellant's sole appeal issue lacks merit and the judgment of sentence should be affirmed. Nothing further remains to be determined at this time.

---

[11] Although it is axiomatic that the use of a deadly weapon on a vital part of the body is sufficient to infer malice, we note case law does not ascribe a *mens rea* to this well-settled principle. Because the holdings in *Seibert* and *McBride* are premised on a reckless course of conduct coupled with use of deadly weapon on a vital part of the body, we feel it appropriate to extend that logic to find a reckless course of conduct can cause the use of a deadly weapon on a vital part of the body, thus giving rise to an inference of malice.

**BY THE COURT:**

_____
**MARGHERITA PATTI-WORTHINGTON, P.J.**

cc:      Chad Martinez, Esq., Assistant District Attorney
Eric E. Winter, Esq., Counsel for Appellant
Cody Saylor, Appellant
Court Administration
Clerk of Courts
Prothonotary–Superior Court